[No. A023536. First Dist., Div. One. May 22, 1984.]

CITY OF ALAMEDA, Plaintiff and Appellant, v.
PREMIER COMMUNICATIONS NETWORK, INC., Defendant and
Respondent.

**COUNSEL**

Carter J. Stroud, City Attorney, for Plaintiff and Appellant.

Farrow, Schildhause, Wilson & Rains, Richard D. Harmon, Megan Tootell, Michael J. Henderson and Lynne M. Armstrong for Defendant and Respondent.

**OPINION**

**RACANELLI, P. J.**—The City of Alameda (City) appeals from a judgment (1) awarding Premier Communications Network, Inc., (Premier) a judgment on the pleadings, and (2) declaring City's ordinance No. 1991, which imposed a tax upon "television subscription service" businesses, unconstitutional under the First Amendment to the United States Constitution and article I, section 2, of the California Constitution, and enjoining enforcement of the ordinance.

Ordinance No. 1991,[1] enacted on December 4, 1979, amended the portion of the City's municipal code dealing with business licenses, by imposing a business license tax of 3 percent of annual gross receipts upon "[e]very person conducting a television subscription service business" and upon businesses providing emergency communications systems or alarms.

City alleged in an amended complaint that Premier was engaged in the television subscription service business in the City, under the name "Home Box Office," and had failed to pay the business license fee required by ordinance No. 1991. It sought to recover 3 percent of Premier's gross receipts derived from its business in the City for the fiscal year 1979-1980

---

[1] The full text of ordinance No. 1991 provides as follows:

"*Section 1.* The Alameda Municipal Code is hereby amended by adding Section 13-111(s) to Article 1 and Sections 13-1951 and 13-1952 to Article 9 of Chapter 1, Title XIII, thereof, to read as follows:

"*Sec. 13-111(s). Television Subscription Service.*

"Television subscription service" shall mean a business that sells rights to or subscriptions for the receipt of television signals not available by use of standard antennae. Television subscription service includes, but is not limited to, community antenna systems or other antenna systems required to receive satellite signals or any signal which requires the use of a specific antenna or decoding or unscrambling device.

"*Sec. 13-1951. Television Subscription Service.*

"(a) Every person conducting a television subscription service business shall pay an annual license fee based upon three percent (3%) of the gross receipts of Alameda subscription sales or fees for the previous year, as defined by Section 13-1104, except that the first year's fee shall be three percent (3%) of subscription fees payable thirty (30) days after the subscription is paid.

"(b) In the event that state or federal law preempts the amount chargeable as a tax or franchise fee said annual license fee shall be the maximum allowed under state or federal law not in excess of subsection (a).

"(c) No license may be issued under this Chapter for television subscription service if the City Council may lawfully require a franchise agreement between the television subscription service operator and the City until such agreement is executed.

"*Sec. 13-1952. Emergency Communications Systems.*

"Every person conducting the business of providing fire or police or other emergency communications systems or alarms shall pay the annual license fee set forth for television subscription service (Sec. 13-1951). Persons providing both television subscription service and services hereunder may combine their sales and pay the tax on all receipts under either this Section or Section 13-1951.

"*Section 2.* The Alameda Municipal Code is hereby amended by amending Section 13-1102 of Article 10, Chapter 1, of Title XIII thereof, to read as follows:

"*Sec. 13-1102. Excluded.*

"Persons required to pay license fees under Sections 13-195, 13-195.5, 13-197, 13-1913, 13-1919, 13-1920, 13-1922, 13-1931, 13-1938, 13-1951, and 13-1952 and persons with no previous years' gross receipts shall not pay in lieu fees under this article.

"*Section 3. Purpose.* This ordinance is adopted for revenue purposes only. Only local subscription sales shall be taxed and no regulatory measures unrelated to solicitations are implied herein.

"*Section 4.* This ordinance provides for a tax levy for the usual and current expenses of the City and shall be in full force and effect immediately upon final passage, pursuant to Section 3-11 of the Charter of the City of Alameda."

and each fiscal year thereafter. In responsive pleadings, Premier admitted nonpayment and denied liability on the ground that the tax violated the constitutional guaranties of free speech and press, and cross-complained to enjoin enforcement of ordinance No. 1991 on the theory that the ordinance was unconstitutional and void as applied to Premier. City's answer generally denied the cross-complaint's charging allegations.

At the commencement of trial, on April 21, 1983, the court granted Premier's motion for judgment on the pleadings on the ground that ordinance No. 1991 violated the First Amendment to the United States Constitution and entered a judgment declaring the ordinance unconstitutional and enjoining its enforcement.[2] This appeal followed.

Premier is a multipoint distribution service, headquartered in Burlingame, California, which operates under the name "Home Box Office." It receives signals transmitted from outside the state by satellite at a location in the City of Berkeley and retransmits those signals by microwave to its subscription customers in Bay Area cities, including the City of Alameda. Premier's customers receive the microwave signals through an antenna leased from Premier for viewing via conventional television receivers. Premier provides programming, not otherwise available to television viewers, which includes recently released motion pictures, specially produced programs, sports events, and other entertainment and news programs.

■ The First Amendment prohibits the enactment of any law "abridging the freedom of speech, or of the press . . .," and is applicable to state and municipal action pursuant to the Fourteenth Amendment. (*Douglas* v. *Jeannette* (1943) 319 U.S. 157, 162 [87 L.Ed. 1324, 1328, 63 S.Ct. 877].) It is well settled that municipal ordinances are within the prohibition of the amendment. (*Lovell* v. *Griffin* (1938) 303 U.S. 444, 450 [82 L.Ed. 949, 952, 58 S.Ct. 666].)

■ There is no doubt that Premier, as a disseminator of motion pictures, news, and other information and entertainment programming, engages in conduct protected by the First Amendment guaranties of freedom of speech and press. In *Weaver* v. *Jordan* (1966) 64 Cal.2d 235 [49 Cal.Rptr. 537, 411 P.2d 289], cert. den., 385 U.S. 844 [17 L.Ed.2d 75, 87 S.Ct. 49], our Supreme Court invalidated an initiative measure banning the business of

---

[2]The court's "order re judgment and injunction" setting forth its conclusion that ordinance No. 1991 unconstitutionally infringed rights guaranteed by the First Amendment to the United States Constitution and article I, section 2, of the California Constitution embraced the same legal issue raised by Premier's motion for judgment on the pleadings and by its cross-complaint.

home subscription television in California as an abridgement of free speech guaranties. The court there observed that "[c]ommunication by motion picture, by radio and by television falls within the constitutional protection" and that "amusement and entertainment as well as the exposition of ideas" are encompassed within such protection. (*Id.*, at p. 242.) These principles are firmly embedded in the decisions of the United States Supreme Court. (See, e.g., *Schad* v. *Borough of Mount Ephraim* (1981) 452 U.S. 61, 65 [68 L.Ed.2d 671, 678, 101 S.Ct. 2176] ["Entertainment, as well as political and ideological speech, is protected; motion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works, fall within the First Amendment guarantee. (Citations.)"]; *Joseph Burstyn, Inc.* v. *Wilson* (1952) 343 U.S. 495, 501-502 [96 L.Ed. 1098, 72 S.Ct. 777] [motion pictures, like books, magazines, and newspapers, are included within free speech and free press guaranties even though sold for a profit]; *Winters* v. *New York* (1948) 333 U.S. 507, 510 [92 L.Ed. 840, 847, 68 S.Ct. 665] ["The line between the informing and the entertaining is too elusive for the protection of that basic right (of free speech). Everyone is familiar with instances of propaganda through fiction. What is one man's amusement, teaches another's doctrine."].)

■ In its most recent pronouncement dealing with economic regulation of the press, our highest court reemphasized that "A tax that burdens rights protected by the First Amendment cannot stand unless the burden is necessary to achieve an overriding governmental interest." (*Minneapolis Star* v. *Minnesota Comm. of Rev.* (1983) 460 U.S. 575, 582 [75 L.Ed.2d 295, 303; 103 S.Ct. 1365], citing *United States* v. *Lee* (1982) 455 U.S. 252 [71 L.Ed.2d 127, 102 S.Ct. 1051].) While acknowledging decisions upholding economic regulations generally applicable to all businesses, the court concluded that "[d]ifferential taxation of the press . . . places such a burden on the interests protected by the First Amendment that we cannot countenance such treatment unless the State asserts a counterbalancing interest of compelling importance that it cannot achieve without differential taxation." (460 U.S. at p. 585 [75 L.Ed.2d at p. 305].)

The challenged tax in *Minneapolis Star* was a "use tax" imposed upon paper and ink products consumed in the production of a publication. Such paper and ink became the only items subject to the state's use tax which were components of goods to be sold at retail. The court found that this treatment of publishers differed from that of other enterprises in at least two ways: the use tax did not protect the sales tax (which exempted periodic publications, resulting in no "complementary function" to serve), and was levied on intermediate transactions rather than ultimate retail sales. (460 U.S. at p. 582 [75 L.Ed.2d at p. 302].) The Supreme Court concluded that this

special use tax, unparalleled under Minnesota's tax scheme, singled out the press for special treatment. In examining whether such differential treatment was constitutionally permissible, the court stated: "The main interest asserted by Minnesota in this case is the raising of revenue. Of course that interest is critical to any government. Standing alone, however, it cannot justify the special treatment of the press, for an alternative means of achieving the same interest without raising concerns under the First Amendment is clearly available: the State could raise the revenue by taxing businesses generally, avoiding the censorial threat implicit in a tax that singles out the press." (460 U.S. at p. 586 [75 L.Ed.2d at p. 305], fn. omitted.)

Responding to Minnesota's contention that the use tax was merely a less onerous, substitute tax which could be generally and permissibly applied to the press, the court held that the state had offered no adequate justification for the differential tax, which was impermissible even if it did not currently impose a greater effective burden since "the very selection of the press for special treatment threatens the press not only with the current *differential* treatment, but with the possibility of subsequent differentially *more burdensome* treatment." (460 U.S. at p. 588 [75 L.Ed.2d at p. 307], original italics.) The court reasoned that the state's interest in requiring the press to bear its share of the tax burden could be achieved by taxing the press equally with others, thus avoiding differential tax treatment in accomplishing its revenue generating objectives. (460 U.S. at pp. 589-590 [75 L.Ed.2d at pp. 307-308].) Accordingly, such differential tax violated First Amendment guaranties.[3]

■ Under the teachings of *Minneapolis Star,* we find that the City's business license tax on television subscription service businesses fails to pass constitutional muster as applied to Premier. The record before the trial court and us, consisting of the pleadings and pertinent portions of the City's municipal code, unmistakably establishes that the challenged tax is differentially burdensome to television subscription service businesses, thus triggering an inquiry whether that burden is impermissible under the First Amendment.

Under the relevant provisions of the City's code, judicially noticed below, (see Evid. Code, § 452; *Stencel Aero Engineering Corp.* v. *Superior Court*

---

[3]The *Minneapolis Star* court found further constitutional infirmity in that the use tax, which exempted the first $100,000 of paper and ink used in any calendar year, unfairly targeted a handful of publishers whose use of such products exceeded the exempt amount. (460 U.S. at pp. 591-592 [75 L.Ed.2d at pp. 308-309].) Noting that no similar exemption existed for other small enterprises, the court held that "to tailor the tax so that it singles out a few members of the press presents such a potential for abuse that no interest suggested by Minnesota can justify the scheme." (460 U.S. at p. 592 [75 L.Ed.2d at p. 309].)

(1976) 56 Cal.App.3d 978, 986-987 [128 Cal.Rptr. 691]), an annual business license tax is imposed upon 87 types of businesses under a variety of methods. These methods include flat fees, "per unit" fees, flat fees plus sums based upon the number of employees, and fees tied to gross receipts.[4] Only four businesses pay fees tied to gross receipts. Outdoor advertisers pay a maximum of $900 plus $150 for each $30,000 gross receipts or fraction thereof in excess of $75,000. (Alameda Municipal Code, § 13-195.) Drive-in theaters pay $45 for $20,000 or less of gross receipts, plus $2.25 for each $1,000 gross receipts or fraction thereof in excess of $20,000 (*Id.,* § 13-1938.) Only the remaining two, television subscription service businesses and businesses providing emergency communications systems or alarms, are subject to ordinance No. 1991. Those businesses are required to pay 3 percent of their gross receipts from Alameda subscription sales or fees. (*Id.,* §§ 13-1951, 13-1952.)

Additionally, most businesses are permitted to pay "in lieu" license fees based upon gross receipts rather than the other fees set forth in the code. The "in lieu" tax schedule ranges from $0.30 per $1,000 to $2.25 per $1,000 (*Id.,* § 13-1105.) Ten types of businesses are *excluded* from electing to pay "in lieu" fees: the four (including television subscription service businesses) whose license fees are tied to gross receipts and six others. (*Id.,* § 13-1102.) Of those six, five pay fees subject to a ceiling, the highest being $600. The sixth category, persons leasing hotels or office buildings, pays $4 per room.

It is thus apparent that the two types of businesses subject to ordinance No. 1991 are taxed differently from any other business in the City.[5] Not only is Premier taxed differently from the great majority of businesses, it is

---

[4]Eight types of businesses pay a flat fee, the maximum being $600 per year. (Alameda Municipal Code, §§ 13-199, 13-1910, 13-1913, 13-1919 to 13-1921, 13-1928, 13-1932.) Twenty-three types pay "per unit" fees (e.g., a certain amount per a certain number of employees, rooms, seats or mechanical devices). (*Id.,* §§ 13-191 to 13-193, 13-196 to 13-198, 13-1911, 13-1912, 13-1914, 13-1916, 13-1922, 13-1923, 13-1925, 13-1927, 13-1929, 13-1931, 13-1934, 13-1935, 13-1939, 13-1941 to 13-1943, 13-1950.) Illustrative of such fees are those based upon $45 for the first person employed; $9 for each of the next 9 employees; and $4.50 for each additional employee. Three types pay the greater of $75 or the amount derived from the $45/$9/$4.50 per employee formula. (*Id.,* §§ 13-1915, 13-1917, 13-1930.)

Forty-nine types of businesses pay a flat fee plus sums based upon the number of employees. (*Id.,* §§ 13-194, 13-1924, 13-1933.) Forty-seven of these are professional or semi-professional businesses. They pay a fee of $45, $75, or $105, plus $15 per employee. Four additional types of businesses, including television subscription service businesses, pay a fee tied to gross receipts.

[5]Since the validity of ordinance No. 1991 as applied to businesses providing emergency communications systems or alarms is not before us, we express no views with respect to such issue.

also taxed in a differentially more burdensome manner. For example, assuming annual gross receipts of approximately $210,000 as indicated by Premier, its business license tax for one year would be $6,300. Unlike Premier, most businesses are permitted to pay under the "in lieu" tax schedule. The maximum tax on $210,000 under that schedule would be $472.50 ($2.25 per $1,000 or less than one thirteenth of a 3 percent rate). Moreover, the businesses subject to ordinance No. 1991 also receive differentially burdensome treatment in comparison to the other businesses which are precluded from paying the "in lieu" tax.[6] Lastly, while it is difficult to meaningfully compare rates imposed upon persons leasing hotel or office space with the treatment accorded Premier, it would require a hotel or office building of exceptional capacity (over 1,500 rooms) to generate the same level of tax revenue sought to be exacted from Premier.

Under the principles set forth in *Minneapolis Star,* the tax burden imposed upon Premier, a disseminator of protected speech, cannot stand unless that burden is necessary to achieve an overriding governmental interest. The only interest asserted to justify the differential tax burden is the generation of revenue. (See Section 3 of ordinance No. 1991, *ante,* fn. 1.) While that purpose is an interest critical to any government, it cannot, standing alone, justify special treatment of a segment of the media which disseminates protected speech when alternative means of achieving the same interest without implicating First Amendment concerns are available. (*Minneapolis Star* v. *Minnesota Comm. of Rev., supra,* 460 U.S. 575, 586 [75 L.Ed.2d 295, 305].)

In an attempt to justify such differential treatment, City argues that a legitimate distinction can be drawn between businesses which may elect to be taxed under the optional "in lieu" schedule and those—such as Premier—which may not. It contends that the former pay taxes and provide employment in the City of Alameda, while the latter do not. We remain unconvinced. Many of the business activities precluded from "in lieu" tax schedule treatment (e.g., outdoor advertisers, amusement parks and exhibitions, drive-in theaters, dance halls, handbill distributors and rental services) undoubtedly pay city property taxes and employ local residents.

The City has shown no adequate justification for the special treatment of television subscription service businesses. In *Minneapolis Star,* the Supreme Court observed that the State of Minnesota could have achieved its goal of raising revenue by simply taxing businesses generally (460 U.S. at p. 586

---

[6]An outdoor advertiser with gross receipts of $210,000 would pay a license fee of $1,650 (a rate of less than 0.8 percent, approximately one-fourth of the rate imposed under ordinance No. 1991); a drive-in theater with such revenue would pay $472.50, substantially less than the advertiser. As earlier noted, five others pay set fees not exceeding $600.

[75 L.Ed.2d at p. 305; cf. *United States* v. *Lee, supra,* 455 U.S. 252 [generally applicable tax enforceable notwithstanding religious objections]). Here, although the City could have likewise achieved a similar objective by imposing a generally applicable tax on businesses,[7] it chose not to do so.

Since the tax imposed by ordinance No. 1991 places a differential burden upon television subscription service businesses unjustified by any compelling interest of the City, that ordinance, as applied to Premier, violates the First Amendment to the United States Constitution.[8] In view of our determination, it is unnecessary to reach Premier's argument based upon state constitutional grounds.

We modify the judgment to declare that ordinance No. 1991 is unconstitutional as applied to Premier and to enjoin its enforcement with respect to Premier only. As so modified, the judgment is affirmed.[9]

Elkington, J., and Newsom, J., concurred.

A petition for a rehearing was denied June 21, 1984, and appellant's petition for a hearing by the Supreme Court was denied August 15, 1984.

---

[7]City's reliance on *City of Corona* v. *Corona Etc. Independent* (1953) 115 Cal.App.2d 382 [252 P.2d 56], cert. den., 346 U.S. 833 [98 L.Ed. 356, 74 S.Ct. 2], which upheld a business license tax on a newspaper, is misplaced. The City of Corona's tax was nondiscriminatory and applied to all businesses conducted in the city. And to the extent that the City suggests that a tax cannot be struck down unless the enacting legislative body intended to censor speech, that contention has been squarely rejected in *Minneapolis Star.* (460 U.S. 575, 592-593 [75 L.Ed.2d 295, 309].)

[8]While the rationale of our opinion would apply to any television subscription service business engaged in dissemination of speech protected by the First Amendment, the case before us involves only the specific business activities of Premier. Thus, we need not speculate as to whether *every* "television subscription service business" engages in similar protected activities.

[9]Much of the City's brief is directed to the question of whether ordinance No. 1991 applies to cable television businesses. While it is true that the trial court concluded that ordinance No. 1991 violated the First Amendment due to differential treatment between television subscription service businesses which do not have a cable television franchise and those which do have such a franchise, we find it unnecessary to address those issues, having concluded for other reasons that the ordinance is unconstitutional as applied to Premier. It is the action of the lower court, not the reasons for its action, which we review. If right upon any theory of the law applicable to the case, a judgment will be sustained regardless of the considerations which may have moved the trial court to its conclusion. (*D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 19 [112 Cal.Rptr. 786, 520 P.2d 10].)

Additionally, we note that the propriety of franchise fees which the City requires of cable television businesses is in no way involved in this case.