[No. B023000. Second Dist., Div. Two. May 28, 1987.]

TIMES MIRROR COMPANY et al., Plaintiffs and Appellants, v. CITY OF LOS ANGELES, Defendant and Respondent.

COUNSEL

Gibson, Dunn & Crutcher, Rex S. Heinke, William C. Foutz, Kelli L. Sager, William A. Niese, Jeffrey S. Klein, Hufstedler, Miller, Carlson & Beardsley, Fred L. Leydorf, Sheppard, Mullin, Richter & Hampton, Frank Simpson III and Kathyleen A. O'Brien for Plaintiffs and Appellants.

Harry P. Warner and Henry L. Baumann as Amici Curiae on behalf of Plaintiffs and Appellants.

James K. Hahn, City Attorney, Thomas C. Bonaventure, Senior Assistant City Attorney, Richard A. Dawson, Assistant City Attorney, and Michael L. Klekner, Deputy City Attorney, for Defendant and Respondent.

OPINION

**COMPTON, Acting P. J.**—In an action for declaratory relief, injunction, and recovery of taxes paid under protest by plaintiffs Times Mirror Company, Tribune Newspapers West, Inc., and Lozano Enterprises, each engaged in the printing and publication of a daily newspaper or newspapers,[1] the trial court determined that a business tax levied against them by defendant City of Los Angeles (City) was constitutionally valid. Summary judgment was thereafter entered in favor of the City and this appeal followed. We affirm.

The facts are undisputed. Los Angeles Municipal Code (L.A.M.C.) section 21.03 requires that a business tax registration certificate must be obtained and a business tax paid by every person who engages in any of the businesses or occupations enumerated in subsequent sections. The section further provides that the tax is imposed pursuant to the City's taxing power solely

---

[1]During and prior to 1984, the Times Mirror Company published the Los Angeles Times and Lozano Enterprises published La Opinion. Although at the outset of this litigation Tribune Newspapers West, Inc. published both the Daily News and the 'Greensheet Shopper, the Daily News is currently owned and published by the Cooke Media Group, Inc.

for the purpose of generating revenue.[2] Different businesses pay taxes calculated by a variety of methods, including flat fees, "per unit" fees, daily charges, percentages of payroll, and percentages of gross receipts.[3]

Prior to January 1984, the code expressly exempted from the business tax gross receipts derived from "the publication and sale of newspapers, magazines and other periodicals regularly issued at intervals not exceeding three months" as well as the gross receipts of businesses engaged in radio and television broadcasting. (Former L.A.M.C., § 21.190(c)(7) and (8).) In 1983, however, the city council amended the code to eliminate these exemptions and inserted provisions taxing receipts derived from newspaper sales and advertising (L.A.M.C., §§ 21.166(f), 21.167(e)) and from radio and television broadcasting (L.A.M.C., § 21.189.2). As part of this change, the business of "publishing or publishing and printing" was included within the term "manufacturing" and "newspapers, magazines, periodicals, books and other printed matter" were classified as "goods, wares or merchandise." Pursuant to L.A.M.C. section 21.166, wholesale newspaper sales became subject to an annual business tax of $20.00 per year for the first $20,000 of gross receipts, and $1. for each additional $1,000 of gross receipts or fractional part thereof. (L.A.M.C., § 21.166(a).) Under L.A.M.C. section 21.167, retail newspaper sales became taxed at the rate of $18.75 for the first $15,000 of gross receipts plus $1.25 for each additional $1,000 of gross receipts or fractional part thereof. (L.A.M.C., § 21.167(a).)[4]

---

[2]L.A.M.C. section 21.03 provides in pertinent part: "(a) Subject to the provisions of this Article, a business tax registration certificate must be obtained and a business tax must be paid by every person engaged in any of the businesses or occupations specified in Sections 21.50 to 21.198, inclusive, of this Article; and a business tax is hereby imposed in the amount prescribed in the applicable section. No person shall engage in any business or occupation subject to tax under the provisions of this Article without obtaining a registration certificate and paying the tax required thereunder.

"(b) The business tax registration certificate required to be obtained and the tax required to be paid are hereby declared to be required pursuant to the taxing power of the City of Los Angeles solely for the purpose of obtaining revenue. Compliance with such requirements shall not be construed to be a condition precedent to engaging in any business or occupation within the City of Los Angeles where the imposition of such a condition precedent would be contrary to law."

[3]For the 1984 tax year, 273,125 businesses were subject to the municipal ordinance which raised over $131 million in revenues for the City. In 1985, 250,653 "accounts" generated approximately $142 million in revenues.

[4]Both L.A.M.C. sections 21.166 and 21.167 establish generic classifications and tax rates for all wholesale and retail business activities within the City.

Section 21.166 provides in relevant part: "(a) For every person manufacturing and selling any goods, wares or merchandise at wholesale, or selling any goods, wares or merchandise at wholesale, and not otherwise specifically taxed by other provisions of this Article, the tax shall be $20.00 per year or fractional part thereof for the first $20,000.00 or less of gross receipts, plus $1.00 per year for each additional $1,000.00 of gross receipts or fractional part thereof in excess of $20,000.00; provided that blind persons need not include the first $20,000.00 of gross receipts in the computation of the amount of tax due hereunder, nor be

For purposes of determining the amount of tax due under the foregoing sections, revenue generated from the sale or furnishing of advertising by those engaged in publishing or publishing and printing was included within "gross receipts." As a further result of the amendments to the code, radio and television broadcasters became subject to the same tax rates imposed on retail newspaper sales. (L.A.M.C., § 21.189.2.)[5]

required to pay the minimum tax of $20.00. This exemption shall not subject such blind person to the provisions of Section 21.190 of this Code. (Amended by Ord. No. 140,833, Operative 1/1/71.)

"(b) For the purpose of this section, a wholesale sale or sale at wholesale means a sale of goods, wares or merchandise for the purpose of resale in the regular course of business.

" . . . . . . . . . . . . . . . .

"(f) For the purpose of this section, newspapers, magazines, periodicals, books and other printed matter shall be deemed to be included in the term "goods, wares or merchandise"; publishing or publishing and printing shall be deemed to be included in the term "manufacturing"; and the term "gross receipts" shall mean California receipts from the selling or furnishing of advertising or advertising space in printed matter in addition to California receipts from the sale of goods, wares and merchandise. The provisions of this subsection shall apply only to business tax periods commencing on or after January 1, 1984. (Added by Ord. No. 158,484, Eff. 12/29/83.)"

Section 21.167 states in part: "(a) For every person manufacturing and selling any goods, wares or merchandise at retail or selling any goods, wares or merchandise at retail, and not otherwise specifically taxed by other provisions of this Article, the tax shall be $18.75 per year or fractional part thereof for the first $15,000.00 or less of gross receipts, plus $1.25 per year for each additional $1,000.00 of gross receipts or fractional part thereof in excess of $15,000.00; provided that blind persons need not include the first $15,000.00 of gross receipts in the computation of the amount of tax due hereunder nor be required to pay the minimum tax of $18.75. This exemption shall not subject such blind person to the provisions of Section 21.190 of this Code. (Amended by Ord. No. 140,833, Operative 1/1/71.)

"(b) For the purpose of this section, a retail sale or sale at retail means a sale of goods, wares or merchandise for any purpose other than resale in the regular course of business.

"(c) Whenever a person engages at the same location in two or more businesses of the kind taxed in this section, a joint Registration Certificate shall be issued for all such businesses and the tax shall be measured by the sum of the gross receipts of all such businesses so conducted.

" . . . . . . . . . . . . . . . .

"(e) For the purpose of this section, newspapers, magazines, periodicals, books and other printed matter shall be deemed to be included in the term "goods, wares or merchandise"; publishing or publishing and printing shall be deemed to be included in the term "manufacturing"; and the term "gross receipts" shall mean California receipts from the selling or furnishing of advertising or advertising space in printed matter in additional to California receipts from the sale of goods, wares or merchandise. The provisions of this subsection shall apply only to business tax periods commencing on or after January 1, 1984. (Added by Ord. No. 158,484, Eff. 12/29/83.)"

[5]L.A.M.C. section 21.189.2 provides in pertinent part: "(a) For every person engaged in business as a radio broadcaster or television broadcaster the tax shall be $18.75 per year or fractional part thereof for the first $15,000.00 or less of gross receipts, plus $1.25 per year for each additional $1,000.00 of gross receipts or fractional part therof in excess of $15,000.00.

"(b) For the purpose of this section, the following terms shall be defined as follows: 1. 'Radio Broadcaster' shall mean any person engaging in the business of producing and broadcasting or broadcasting local or network radio programs or advertising material, including but

The ordinance further imposes a tax on all theaters in the City, including movie theaters, which is calculated in the same manner and at the same rate as the tax for retail sales under section 21.167. (L.A.M.C., § 21.147.) Section 21.192 requires those engaged in renting or leasing tangible personal property, including motion picture rentals, to pay a tax of $30 on the first $12,000 of gross receipts, and $2.50 for each additional $1,000 or fraction thereof. Motion picture and cartoon production is classified and taxed under section 21.109. The measure of the tax is based upon the total of the gross costs of production and gross receipts from the lending of employees and the furnishing of studio facilities to other film producers. The tax itself is graduated and ranges from $125 for the first $50,000 of gross receipts and production costs, up to a maximum of $10,750 when the measure of the tax is $4.2 million and above.

In computing the tax owed under the ordinance, income received from the sale of goods shipped out of state is excluded from the gross receipts of both wholesale and retail businesses, including those engaged in the publication of printed material. (L.A.M.C., § 21.168.1.) L.A.M.C. section 21.15(h) further authorizes the city clerk to promulgate rules and regulations for the apportionment of gross receipts "according to the amount of business done in the City of Los Angeles, or in the State of California, as the case may be, . . ." Pursuant thereto, clerk's rulings No. 13 and No. 14, relating to persons with and without a fixed place of business within the City, describe the manner in which gross receipts should and should not be considered "directly attributable" to local activities and provide procedures and practices to be followed in making that determination.

Based upon the foregoing provisions of the municipal ordinance, the Times Mirror Company paid under protest approximately $1.4 million in business taxes for the years 1984 and 1985. For the same period, Tribune Newspapers West, Inc. paid $202,000 and Lozano Enterprises paid $22,000. After exhausting their various administrative remedies to secure a refund from the City, plaintiffs initiated this litigation. Following argument on the

---

not limited to the furnishing of services, program elements or facilities in connection with such production and broadcasting or broadcasting. 2. 'Television Broadcaster' shall mean any person engaging in the business of producing and broadcasting or broadcasting local or network television programs or advertising material, including but not limited to the furnishing of services, program elements or facilities in connection with such production and broadcasting or broadcasting. A 'television broadcaster' shall include any person operating a television system where the viewing audience pays a fee to view the broadcast.

". . . . . . . . . . . .

"(e) The provisions of this section shall apply only to business tax periods commencing on or after January 1, 1984."

Prior to the 1984 amendments, the broadcast media were only subject to the business tax to the extent that they engaged in motion picture production and related activities.

newspapers' motion for summary judgment and the City's motion for summary adjudication of issues, the trial court found that the applicable provisions of the ordinance did not impose a special or discriminatory tax on the newspapers or the media in general. It further held that L.A.M.C. section 21.15(h), authorizing the city clerk to apportion gross receipt taxes, and the rulings promulgated thereunder (i.e., Tax Rulings Nos. 13 and 14), passed constitutional muster.

■ In urging us to reverse, plaintiffs first contend that the business tax is unconstitutional because it unjustifiably imposes a differential tax burden on a variety of First Amendment activities and discriminates between First Amendment and non-First Amendment enterprises. In support of this argument plaintiffs allege that "the tax on fifty million dollars in production costs for the motion picture industry would be $10,750; the same gross receipts received in a year through lectures, shows, or entertainment, would be taxed at only $155; a telephone company receiving the same amount of gross receipts for the Yellow Pages would owe the City $50,000; a billboard company . . . would owe the City $250,000; . . . a newspaper would owe a tax of $62,500 on its retail receipts or $50,000 on its wholesale receipts; and a radio or television broadcaster would owe $62,500. . . ." The newspapers further point out that the City taxes various non-First Amendment businesses at lower rates than those imposed on the broadcast and print media.[6]

■ The power of the City to levy taxes derives from article XI, section 5 of the California Constitution which authorizes charter cities to "make and enforce all ordinances and regulations in respect to municipal affairs. . . ." Taxation for the purpose of generating revenue is a municipal affair within the meaning of article XI. (*City of Los Angeles* v. *A.E.C. Los Angeles* (1973) 33 Cal.App.3d 933, 939 [109 Cal.Rptr. 519].) A municipal taxing scheme is thus valid unless preempted by state law or prohibited by constitutional principles. (*United Business Com.* v. *City of San Diego* (1979) 91 Cal.App.3d 156, 164 [154 Cal.Rptr. 263]; *Century Plaza Hotel Co.* v. *City of Los Angeles* (1970) 7 Cal.App.3d 616, 622 [87 Cal.Rptr. 166].) ■ Here, of course, plaintiffs maintain that the City's business tax violates the constitutional guaranties of free speech and press.

■ The First Amendment prohibits the enactment of any law "abridging the freedom of speech, or of the press . . . ," and is applicable to state and municipal action pursuant to the Fourteenth Amendment. (*Douglas* v. *Jeannette* (1943) 319 U.S. 157, 162 [87 L.Ed.2d 1324, 1328, 63 S.Ct. 877];

---

[6]As evidence of these lower rates, plaintiffs cite to provisions of the ordinance which tax amusement rides at an annual rate of $125 (L.A.M.C., § 21.94), junk dealers at $500 per year (L.A.M.C., § 21.100), shoe repair outlets at $0.75 per $1,000 (L.A.M.C., § 21.186), and trucking-hauling companies at a maximum rate of $0.22 per day (L.A.M.C., § 21.195).

*City of Alameda* v. *Premier Communications Network, Inc.* (1984) 156 Cal.App.3d 148, 152 [202 Cal.Rptr. 684].)

There are two basic ways in which First Amendment rights may be impinged: (1) a direct regulation of speech or press based on the content of the material (see, e.g., *Va. Pharmacy Bd.* v. *Va. Consumer Council* (1976) 425 U.S. 748 [48 L.Ed.2d 346, 96 S.Ct. 1817]); *Keyishian* v. *Board of Regents* (1967) 385 U.S. 589 [17 L.Ed.2d 629, 87 S.Ct. 675]; *Mills* v. *Alabama* (1966) 384 U.S. 214 [16 L.Ed.2d 484, 86 S.Ct. 1434]); or (2) an indirect or incidental regulation of speech or press resulting from pursuit of governmental goals unrelated to freedom of expression (see, e.g., *Buckley* v. *Valeo* (1976) 424 U.S. 1 [46 L.Ed.2d 659, 96 S.Ct. 612]; *Branzburg* v. *Hayes* (1972) 408 U.S. 665 [33 L.Ed. 2d 626, 92 S.Ct. 2646]; *Kovacs* v. *Cooper* (1949) 336 U.S. 77 [93 L.Ed. 513, 69 S.Ct. 448, 10 A.L.R.2d 608]).

The instant case presents a question falling into the second category: the incidental or indirect impact of taxation on First Amendment activities. (See *Murdock* v. *Pennsylvania* (1943) 319 U.S. 105, 112 [87 L.Ed. 1292, 1298, 63 S.Ct. 870].) The structure of the tax is not content oriented.

Although the government may not unduly burden freedom of speech or of the press through taxation or other regulatory measures, it is beyond dispute that the provisions of the First and Fourteenth Amendments do not exempt newspapers and the business of newspaper publication from generally applicable economic regulations and taxes. (*Grosjean* v. *American Press Co.* (1936) 297 U.S. 233, 249 [80 L.Ed. 660, 668, 56 S.Ct. 444]; *Festival Enterprises, Inc.* v. *City of Pleasant Hill* (1986) 182 Cal.App.3d 960, 963 [227 Cal.Rptr. 601]; *City of Corona* v. *Corona Daily Independent* (1953) 115 Cal.App.2d 382, 387 [252 P.2d 56].)

■ The state has the power to enact statutes which impose taxes on all businesses, including the press, in order to generate revenue so long as those laws operate evenhandedly upon all similarly situated. (*Fox etc. Corp.* v. *City of Bakersfield* (1950) 36 Cal.2d 136, 142 [222 P.2d 879].) "The power to create classifications for taxation purposes is a broad one, within the discretion of the Legislature, and is subject only to limitations of the state and federal Constitutions." (*Festival Enterprises, Inc.* v. *City of Pleasant Hill, supra,* 182 Cal.App.3d at p. 963.)

■ Although plaintiffs recognize these general precepts of constitutional law, they contend that here the City has exceeded the limitations of its taxing power. Relying on *Minneapolis Star* v. *Minnesota Comm'r of Rev.* (1983) 460 U.S. 575 [75 L.Ed.2d 295, 103 S.Ct. 1365] and *City of Alameda* v. *Premier Communications Network, supra,* 156 Cal.App.3d 148, plaintiffs

claim that the structure of the City's business tax treats them differently than other similarly situated taxpayers and thus impermissibly impinges on their exercise of First Amendment rights.

In *Minneapolis Star,* the United States Supreme Court held a Minnesota use tax which applied to "publications" to be an unconstitutional burden on the press. While acknowledging decisions upholding economic regulations generally applicable to all businesses, the court concluded that "[d]ifferential taxation of the press . . . places such a burden on the interests protected by the First Amendment that we cannot countenance such treatment unless the State asserts a counterbalancing interest of compelling importance that it cannot achieve without differential taxation." (*Minneapolis Star* v. *Minnesota Comm'r of Rev., supra,* 460 U.S. 575, 585 [75 L.Ed.2d 295, 305].)

The statute at issue in *Minneapolis Star* imposed a general sales tax on the sale of goods above a certain minimum price and a use tax on the "privilege of using, storing or consuming in Minnesota tangible personal property" which was not specifically exempt by statute and on which no sales tax was paid. As ,the court noted, this was a classic use tax designed to complement and protect the sales tax by eliminating a resident's incentive to travel to states with lower sales tax and purchase goods there rather than in Minnesota. Such taxes, in essence, require a resident who shops out of state to pay a "use tax" equal to the sales tax savings. The Minnesota statute provided an exemption from the sales tax for periodic publications, which the plaintiff, the Minneapolis Star and Tribune Company, had enjoyed from 1967 to 1971.

In 1971, the Minnesota Legislature amended the statute to impose a special use tax on the costs of ink and paper used in producing periodic publications, while leaving intact the publications' exemption from the sales tax. The amendment had the effect of creating the only situation in the entire tax scheme where components of goods that were later to be sold at retail were taxed. In all other situations, tax was assessed only when the finished product was purchased by the ultimate user. The only components taxed were ink and paper used in periodic publications. As a result, the tax fell exclusively upon the press. The statute was subsequently amended to exempt from the use tax the first $100,000 worth of ink and paper used in any calendar year by a publication so that, in practice, only a few publishers in the state were subject to use taxation.

These unique features of the Minnesota use tax, not the mere fact that the press was being taxed, led the court to declare the amended statute unconstitutional. In doing so, however, the court stressed that "the states and the

federal government can subject newspapers to generally applicable economic regulations without creating constitutional problems. (*Minneapolis Star* v. *Minnesota Comm'r of Rev., supra,* 460 U.S. 575, 581 [75 L.Ed.2d 295, 302].) The majority noted that "[a]ny tax that the press must pay, of course, imposes some 'burden.' But, as we have observed, [citation] this Court has long upheld economic regulation of the press. The cases approving such economic regulation, however, emphasized the general applicability of the challenged regulation to all businesses . . . ." (*Id.,* at p. 583 [75 L.Ed.2d at p. 303].)

The Minnesota statute failed because it singled out the press for differential tax treatment. The only supporting rationale was the need for revenue —a need which the court noted was better served by taxing all businesses equally. The law did not serve to complement the state's sales tax, as do most use tax statutes, since it imposed a use tax on publications which were specifically exempt by statute from the state's sales tax. The court emphasized, however, that had the tax been a generally applicable sales tax it would probably have been constitutionally permissible. Responding to the argument that the use tax was merely a less onerous, substitute tax which could be generally and permissibly applied to the press, the court held that the state had offered no adequate justification for the differential tax, which was impermissible even if it did not currently impose a greater effective burden since "the very selection of the press for special treatment threatens the press not only with the current *differential* treatment, but also with the possibility of subsequent differentially *more burdensome* treatment." (*Id.,* at p. 588 [75 L.Ed.2d at p. 307], italics in original.)[7]

In *City of Alameda* v. *Premier Communications Network, Inc., supra,* 156 Cal.App.3d 148 , the Court of Appeal for the First District applied the rationale of *Minneapolis Star* in striking down a local business license tax on television subscription service companies. Although the municipal ordinance at issue applied to 87 types of businesses, only 4 were required to pay a gross receipts tax. Of these four, only two, television subscription and emergency communications services, were required to pay 3 percent of their gross receipts. Moreover, most businesses were permitted to pay an "in-lieu" gross receipts tax rather than the otherwise applicable tax set forth in the ordinance. Television subscription services, however, were not eligible to claim the in-lieu taxes. As a result, Premier's tax burden on its annual gross receipts

---

[7]The court also found that the statute was unconstitutional because the use tax, which exempted the first $100,000 of paper and ink used in any calendar year, unfairly targeted a limited number of publishers whose use of such products exceeded the exempt amount. Noting that no similar exemption existed for other small enterprises, the court held that "to tailor the tax so that it singles out a few members of the press presents such a potential for abuse that no interest suggested by Minnesota can justify the scheme." (*Minneapolis Star* v. *Minnesota Comm'r of Rev., supra,* 460 U.S. 575, 592 [75 L.Ed.2d 295, 309].)

of $210,000 was $6,300. If the company had been permitted to pay the in-lieu tax, its burden would have been only $472.

Concluding that only two types of businesses were required to pay 3 percent of gross receipts without any alternative, the court found the tax invalid, holding that Premier was taxed differently than the great majority of businesses and in a more burdensome manner. "Under the principles set forth in *Minneapolis Star,* the tax burden imposed upon Premier, a disseminator of protected speech, cannot stand unless that burden is necessary to achieve an overriding governmental interest. The only interest asserted to justify the differential tax burden is the generation of revenue. [Citation.] While that purpose is an interest critical to any government, it cannot, standing alone, justify special treatment of a segment of the media which disseminates protected speech when alternative means of achieving the same interest without implicating First Amendment concerns are available. [Citation.]" (*City of Alameda* v. *Premier Communications Network, Inc., supra,* 156 Cal.App.3d 148, 156.)

The municipal ordinance here does not possess the constitutional infirmities that were present in either *Minneapolis Star* or *Premier Communications.* Although the City's tax is levied upon the privilege of engaging in or transacting business, it is, on its face, and in fact, a tax for revenue purposes only, and does not grant or take away any right to do business. The tax is neither special nor unique and is generally applicable to all those engaged in wholesale or retail business activities. In no way does the tax resemble a penalty directed at only a few publications. (Cf. *Arkansas Writers' Project, Inc.* v. *Ragland* (1987) 481 U.S. 221 [95 L.Ed.2d 209, 107 S.Ct. 1722].) The press is not singled out for differential treatment since the tax rates established by the ordinance apply to all manufacturers and sellers alike, including publishers.

Plaintiffs nevertheless argue that both *Minneapolis Star* and *Premier Communications* stand for the proposition that all First Amendment activities must be taxed at the same rate and that there must be parity between First Amendment and non-First Amendment businesses. Neither the cases cited nor the Constitution mandate such requirements.

Plaintiffs' challenge, which is couched in terms of equal protection, must stand or fall with the novel proposition that a municipality is powerless to employ more than one method of computing taxes for various businesses unless it can demonstrate some compelling justification for doing so. ■ Although those engaged in protected speech may not be singled out for discriminatory tax treatment in the absence of counterbalancing governmental interest of compelling importance that cannot be achieved without

differential taxation (*Festival Enterprises, Inc.* v. *City of Pleasant Hill, supra,* 182 Cal.App.3d 960, 964; *City of Alameda* v. *Premier Communications Network, Inc., supra,* 156 Cal.App.3d 148, 153), no such counterbalancing interest need be present when the tax measure does not result in a discriminatory burdening of First Amendment rights. (*Vance* v. *Bradley* (1979) 440 U.S. 93 [59 L.Ed.2d 171, 99 S.Ct. 939]; *Fox etc. Corp.* v. *City of Bakersfield, supra,* 36 Cal.2d 136, 141-142.)

■ Having determined that the City's ordinance does not impose a peculiar or differential burden on plaintiffs' businesses in violation of the First Amendment, we must only determine whether the varying rates established by the taxing scheme are "founded on natural, intrinsic or fundamental distinctions which are reasonable in their relation to the object of the legislation. . . ." (*Fox etc. Corp.* v. *City of Bakersfield, supra,* 36 Cal.2d at p. 142.)

■ The power of a municipality to classify for the purpose of taxation is very broad. Neither due process nor equal protection impose a rigid rule of equality in tax legislation. (*Henry's Restaurants of Pomona, Inc.* v. *State Bd. of Equalization* (1973) 30 Cal.App.3d 1009, 1016 [106 Cal.Rptr. 867], and cases cited therein.) "It is well settled that occupations and businesses may be classified and subdivided for purposes of taxation, and it is within the discretion of the Legislature to exact different license taxes from different classes or subclasses of businesses, subject only to the limitations of the state and federal Constitutions in regard to equal protection of the laws. ■ No constitutional rights are violated if the burden of the license tax falls equally upon all members of a class, though other classes have lighter burdens or are wholly exempt, provided that the classification is reasonable, based on substantial differences between the pursuits separately grouped, and is not arbitrary." (*Fox etc. Corp.* v. *City of Bakersfield, supra,* 36 Cal.2d at p. 142; *Gutknecht* v. *City of Sausalito* (1974) 43 Cal.App.3d 269, 276 [117 Cal.Rptr. 782]; *Associated Home Builders etc., Inc.* v. *City of Newark* (1971) 18 Cal.App.3d 107, 109-110 [95 Cal.Rptr. 648]; *Clark* v. *City of San Pablo* (1969) 270 Cal.App.2d 121, 126-127 [75 Cal.Rptr. 726].)

The power to license for purposes of generating revenue involves the right to make distinctions between different trades and between essentially different methods of conducting the same general character of business. (See *City of Los Angeles* v. *Crawshaw Mortgage & Inv. Co.* (1975) 51 Cal.App.3d 696, 703 [124 Cal.Rptr. 363].)[8] "It is recognized that a legislative body may

---

[8]The U.S. Supreme Court's observations in *Regan* v. *Taxation With Representation of Wash.* (1983) 461 U.S. 540, 547-548 [76 L.Ed.2d 129, 138, 103 S.Ct. 1997] are particularly applicable here: "Legislatures have especially broad latitude in creating classifications and

classify and subdivide classes within those engaged in one generic field of activity where there is a reasonable basis for such action. [Citations.]" (*Clark v. City of San Pablo, supra,* 270 Cal.App.2d at p. 131.)

■ The classifications created by the City's taxing scheme are anything but arbitrary or unreasonable. On its face the ordinance purports to impose a tax on "every person manufacturing and selling goods, wares, or merchandise" at both the wholesale and retail levels. (L.A.M.C., §§ 21.166, 21.167.) Independent contractors and those engaged in the rental of tangible personal property also are taxed at specified rates. (L.A.M.C., §§ 21.190, 21.192.) By amendment, newspapers and other periodicals are classified as "goods, wares, or merchandise" while publishing and printing are categorized as "manufacturing."

These various distinctions flow naturally from differences in the methods and procedures used in conducting the business activities subject to the ordinance and thus afford an acceptable basis for imposing disparate rates of taxation. (See *Alco Plating Corp.* v. *City of Los Angeles* (1974) 39 Cal.App.3d 948, 951-952 [114 Cal.Rptr. 506].) Within each broad classification, however, all businesses are taxed similarly.

Even a cursory review of the law reveals that all members of the press are treated alike; that the press and all other publishing enterprises are treated similarly; and that all publishing enterprises are treated identically with other wholesalers and retailers. The City has not created an artificial class of businesses in order to tax some who are engaged in the same business and not others. The amount of plaintiffs' tax is determined by no means other than by the amount of their business activities. (See *City of Los Angeles* v. *Lankershim* (1911) 160 Cal. 800, 804 [118 P. 215].)

■ Plaintiffs' argument that the municipal tax scheme is unconstitutional because the City has chosen to use a different method of computing

---

distinctions in tax statutes. More than 40 years ago we addressed these comments to an equal protection challenge to tax legislation: 'The broad discretion as to classification possessed by a legislature in the field of taxation has long been recognized. ... [T]he passage of time has only served to underscore the wisdom of that recognition of the large area of discretion which is needed by a legislature in formulating sound tax policies. Traditionally classification has been a device for fitting tax programs to local needs and usages in order to achieve an equitable distribution of the tax burden. It has, because of this, been pointed out that in taxation, even more than in other fields, legislatures possess the greatest freedom in classification. Since the members of a legislature necessarily enjoy a familiarity with local conditions which this Court cannot have, the presumption of constitutionality can be overcome only by the most explicit demonstration that a classification is a hostile and oppressive discrimination against particular persons and classes. The burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it.' [Citation.]"

the tax levied against motion picture production than it has for newspaper publication or radio and television broadcasting is unpersuasive. The inherent difference between these various forms of mass media is patent. These differences are reflected in the ways in which the ultimate product is conceived, produced, disseminated, and exhibited.

Plaintiffs nonetheless maintain that they should be required to pay no more in taxes than a film producer with the same gross receipts. They have not shown, nor can they show, that a producer, in making a film, operates in a manner similar to a business which manufactures and sells daily newspapers or to any other retailer or wholesaler. Plaintiffs' analysis also ignores the fact that the motion picture industry is highly fragmented (see, e.g., *United States* v. *Paramount Pictures* (1948) 334 U.S. 131 [92 L.Ed. 1260, 68 S.Ct. 915]) and that the City separately classifies and taxes each of these various fragments as different business activities.[9]

Even if the cap on the amount of tax imposed on motion picture production is viewed as a subsidy of that business, it would not afford plaintiffs a basis for attacking the tax scheme. █ If the state subsidizes some First Amendment activity but not all, no suspect classification is created. Conversely, the failure "to subsidize the exercise of a fundamental right does not infringe [that] right." (*Regan* v. *Taxation with Representation of Wash.*, *supra*, 461 U.S. 540, 549 [76 L.Ed.2d 129, 139].)

█ Furthermore, occupations and businesses, including the entertainment industry, may be properly subdivided and separately classified if the classification is founded on natural, intrinsic or fundamental distinctions which are reasonable in their relation to the object of the legislation. (See *City of Berkeley* v. *Oakland Raiders* (1983) 143 Cal.App.3d 636, 639 [192 Cal.Rptr. 66]; *United Business Com.* v. *City of San Diego* (1979) 91 Cal.App.3d 156, 178 [154 Cal.Rptr. 263].) In other words, the classification within the ordinance does not violate equal protection "if the distinction rests upon a rational basis, and it must be presumed to rest on that basis if there is any conceivable state of facts which would support it." (*City of San Jose* v. *Donohue* (1975) 51 Cal.App.3d 40, 45 [123 Cal.Rptr. 804].)

██ We conclude that the tax rate distinctions which may exist between different members of the media and between the media and other taxpayers are constitutionally permissible and in no way impinge on the exercise of plaintiffs' rights under the First Amendment.

---

[9]Motion picture production is taxed by L.A.M.C. section 21.109; distribution (vis-à-vis sales) by sections 21.166 and 21.167; exhibition by section 21.147; and rentals by section 21.192.

 Next we reject plaintiffs' contention that the ordinance is unconstitutional on its face because it grants the city clerk absolute discretion in apportioning the amount of gross receipt taxes to be collected from businesses engaged in protected First Amendment activities. Apportionment is required to prevent the tax from having an extraterritorial impact.

L.A.M.C. section 21.15(h) provides in relevant part: "When, by reason of the provisions of the Constitution of the United States or the Constitution of California, the business tax imposed by this Article cannot be enforced without there being an apportionment according to the amount of business done in the City of Los Angeles, or in the State of California, as the case may be, the City Clerk may make such rules and regulations for the apportionment of the tax as are necessary or desirable to overcome the constitutional objections." Pursuant to the authority granted him by this section, the city clerk adopted Tax Rulings Nos. 13 and 14 for the apportionment of gross receipts of taxpayers subject to sections 21.166 and 21.167. Each is applicable to all businesses classified as either a wholesaler or retailer, including those engaged in the business of publishing or publishing and printing. The rulings essentially provide for an apportionment formula based upon various specified physical elements[10] and further provide that any taxpayer who

---

[10]Pursuant to Rule No. 13, the measure of tax for "a person who does not own, lease, occupy or otherwise maintain within the City of Los Angeles a place or premises upon which or from which he engages in business" is as follows: "(a) 35% of those gross receipts from all sales to customers located within the City of Los Angeles, where delivery or shipment is made to points within the City by vehicles operated by the taxpayer. (b) 30% of those gross receipts from all sales to customers located within the City of Los Angeles where delivery or shipment is made to points within the City by means other than vehicles operated by the taxpayer regardless of the f.o.b. point or other conditions of sale. (c) 30% of those gross receipts from all sales to customers located within the City of Los Angeles where delivery or shipment is made to points outside the City."

Under Rule No. 14, the measure of tax for "[a] person who manufactures any goods, wares, or merchandise within the City of Los Angeles" is "the total gross receipts from the sale of goods manufactured in the City." The regulation further provides that "[a] person who owns, leases, occupies or otherwise maintains within the City a place or premises upon which, or from which he engages in the business of selling goods, wares, and merchandise, *not manufactured by the taxpayer in the city and whose gross receipts from such sales are attributable to business activities carried on within the City and activities carried on outside the City,* may apportion such gross receipts *directly attributable* to activities carried on within the City. [¶] In making a calculation of gross receipts to be reported as the measure of tax, the person may deduct from 100% of gross receipts the percentage of gross receipts deemed to be directly attributable to selling activities carried on by such person outside the City of Los Angeles. For the purpose of this calculation, the person may deduct ... the following percentages of those sales, or particular categories of sales, on which the corresponding elements of the selling process are performed at a place or location outside the City:

"1. Up to 30% for the location where the sale is negotiated or solicited by the taxpayer, through the physical presence of himself, his employees or his agents.

"2. Up to 20% for the sales office which serves as the base of operations for sales activities, or if there is no sales office which serves as a base of operations, the office from which the sale activities are directed or controlled.

believes that the percentages do not apply to his or her particular business may petition the city clerk for a modification of the formula. The taxpayer has the burden of establishing the modification.

Relying on a series of United States Supreme Court decisions which hold that a public official may not be granted unfettered discretion to deny or regulate the issuance of licenses or permits, thus limiting or restricting access to protected speech (see, e.g., *Shuttlesworth* v. *Birmingham* (1969) 394 U.S. 147 [22 L.Ed.2d 162, 89 S.Ct. 935]; *Kunz* v. *New York* (1951) 340 U.S. 290 [95 L.Ed.2d 280, 71 S.Ct. 312]; *Schneider* v. *State* (1939) 308 U.S. 147 [84 L.Ed. 155, 60 S.Ct. 146]), plaintiffs argue that the City's ordinance infringes upon their First Amendment rights by giving the city clerk blanket authority to prescribe formulas for the apportionment of taxes. Plaintiffs' reliance on these cases is totally misplaced.

The business tax with which we are here concerned is strictly a revenue measure. While a registration certificate is required by L.A.M.C. section 21.03, no conditions are placed upon the right to such a document. The certificate is required not to regulate but to expedite the collection of revenue. (See *City of Los Angeles* v. *A.E.C. Los Angeles, supra,* 33 Cal.App.3d 933, 940.) Plaintiffs nonetheless contend that "it is difficult to see any distinction between a 'licensing' ordinance and the City Tax Ordinance as written" apparently because of the various provisions of the law relating to enforcement procedures. These procedures, however, do nothing more than insure the collection and remittance of the tax and assure that accounting and record keeping standards are properly maintained. Such regulations are necessary adjuncts to the municipal taxing power and in no manner restrict access to protected speech.[11]

---

"3. Up to 10% for the location where orders or contracts are accepted or approved. Such acceptance or approval shall be deemed to take place at the location of the office specified in item 2 above, unless there is clear and conclusive evidence that a binding acceptance or approval occurs elsewhere.

"4. Up to 20% for any facility, operated by the taxpayer, where the goods, wares or merchandise are stored immediately prior to shipment or delivery.

"5. Up to 5% for the location which gives the order for, or arranges for, the shipment or delivery of articles sold.

"6. Up to 5% for the place where billing procedures are performed.

"7. Up to 5% for the place where the collecting of receipts is performed.

"8. Up to 5% for the place to which merchandise is delivered, by vehicles operated by the taxpayer." (Italics added.)

[11]Much of plaintiffs' argument relates to L.A.M.C. section 21.189.2. That section, however, pertains only to radio and television broadcasters and, by its very terms, has no application to the publication of newspapers or other printed matter. Subdivisions (c) and (d) provide as follows: "When gross receipts are constitutionally required to be apportioned and are derived from or attributable to activities engaged in within and without the City, gross receipts

The argument that section 21.15(h) is unconstitutional because it does not provide any formula, rule or specific standard for the apportionment of gross receipts is equally unavailing. ▮ It has long been established that a legislative body need not prescribe the exact means by which a tax is to be fixed but may delegate to its taxing officers the power to adopt a suitable method. (*El Dorado Oil Works* v. *McColgan* (1950) 34 Cal.2d 731, 737-738 [215 P.2d 4]; *Pacific Fruit Express Co.* v. *McColgan* (1944) 67 Cal.App.2d 93, 101-102 [153 P.2d 607].) "The essential requirement is the Legislature's specification of a standard—'an intelligible principle to which the person or body authorized to [administer the act] is directed to conform' [citation]—but it may leave to the administrative agency the precise determination necessary to bring the standard into operation." (*El Dorado Oil Works* v. *McColgan, supra,* 34 Cal.2d 731, 738.) Section 25.12(h) surely complies with this principle by directing the city clerk to make "such rules and regulations for the apportionment of the tax as are necessary or desirable" to satisfy the demands of both the federal and state Constitutions. (Cf. *El Dorado Oil Works* v. *McColgan, supra,* 34 Cal.2d 731.)

▮ Citing to *Big Mama Rag, Inc.* v. *United States* (D.C. Cir. 1980) 631 F.2d 1030, plaintiffs appear to argue that the apportionment formulae set forth in Tax Rulings Nos. 13 and 14 must fall before the First Amendment unless the classifications established by the clerk can be justified by a compelling state interest. We disagree.

In *Big Mama Rag, Inc.,* a newspaper's application for tax exempt status was denied because it could not qualify as an "educational institution" as that term had been defined by an Internal Revenue Service regulation. Finding that the definition was overly vague and that the subjective criteria used to evaluate the application was based upon the content of protected speech, the court struck down the regulation as unconstitutional. In so

---

shall be apportioned in a manner that is fairly calculated to determine the amount of gross receipts derived from or attributable to engaging in business in the City. Such apportionment shall be made on the basis of payroll, value and situs of tangible property, general expense, or by reference to any of these or other factors, or by any other method of apportionment as will fairly determine the amount of gross receipts derived from or attributable to engaging in business in the City. Gross receipts derived from or attributable to sources within the City shall include gross receipts from any activities carried on in this City. (d) Notwithstanding the foregoing, the gross receipts used in the measurement of the tax under this section shall be limited to receipts which are generated, produced, or attributable to local activities, in the State of California."

So far as we can discern, the city clerk has not promulgated any formulae for the apportionment of taxes levied under section 21.189.2. Were it necessary to so decide, we would have no difficulty in concluding that the city council's delegation of authority comports with the principles discussed *infra*. Since plaintiffs are in the publishing, not broadcasting, business and are in no way subject to the provisions of section 21.189.2, we need not address this issue in the context of this case.

holding the court observed: "[R]egulations authorizing tax exemptions may not be so unclear as to afford latitude for subjective application by IRS officials. . . ." (*Id.,* at p. 1034.) "Applications for tax exemption must be evaluated . . . on the basis of criteria capable of neutral application. The standards may not be so imprecise that they afford latitude to individual IRS officials to pass judgment on the content and quality of an applicant's views and goals and therefore to discriminate against those engaged in protected First Amendment activities." (*Id.,* at p. 1040.)

The distinction between apportionment and the granting or withholding of a tax exemption is obvious. The city council here has not delegated to the clerk the authority to decide who pays the business tax or when. That official merely determines the manner in which the tax is to be computed based upon objective criteria that is content neutral and relates only to the amount of revenue generated within the City.

Although the formulation of the criteria requires the exercise of judgment, abuses of such judgment are checked both by extensive administrative review and by prompt postdetermination access to the courts. Contrary to the arguments advanced by plaintiffs, neither L.A.M.C. section 21.15(h) nor the clerk's tax rulings impose any burden on the exercise of their First Amendment rights. We find no indication that the regulations were intended to suppress any ideas or any demonstration that they have had that effect. Under the circumstances, the various classifications established by the rulings need not be justified by the showing of a compelling state interest.

█ There is no constitutional prohibition against local taxes upon businesses "doing business" both within and outside the taxing jurisdiction so long "as such taxes are apportioned in a manner by which the measure of tax fairly reflects that proportion of the taxed activity which is actually carried on within the taxing jurisdiction. . . ." (*City of Los Angeles* v. *Shell Oil Co.* (1971) 4 Cal.3d 108, 124 [93 Cal.Rptr. 1, 480 P.2d 953]; *City of Los Angeles* v. *London Towne Livery Service, Ltd.* (1979) 97 Cal.App.3d 814, 816-817 [159 Cal.Rptr. 94].) █ Here, the promulgation of the tax rulings constitute a permissible exercise of administrative discretion that fully carries out the intent of the city council. They describe, in a detailed fashion, the manner in which taxes are to be apportioned according to the amount of business activity done within and without the city. The various formulae set forth in the regulations cannot be characterized as arbitrary, capricious or patently unreasonable. As such, we need not inquire further into the clerk's exercise of authority properly delegated to him by the city council.

We have thoroughly considered plaintiffs' remaining arguments and find none that warrant further consideration.

The judgment is affirmed.

Gates, J., and Fukuto, J., concurred.

Appellants' petition for review by the Supreme Court was denied September 2, 1987. Mosk, J., was of the opinion that the petition should be granted.