**GROUP W CABLE, INC., Plaintiff,**

v.

**The CITY OF SANTA CRUZ, the County of Santa Cruz, Defendant.**

No. C–84–7456–WWS.

United States District Court, N.D. California.

Sept. 9, 1987.

Harold R. Farrow, Farrow, Schildhause, Wilson & Rains, Oakland, Cal., Peter C. Smoot, J. Larson Jaenicke, Rintala, Smoot, Jaenicke & Brunswick, Los Angeles, Cal., for plaintiff.

William M. Marticorena, Philip D. Kohn, Heather A. Mahood, Rutan & Tucker, Costa Mesa, Cal., for City & County of Santa Cruz.

Rodney R. Atchison, City Atty., Neal R. Anderson, Asst. City Atty., Atchison, Anderson & Daly, Santa Cruz, Cal., for City of Santa Cruz.

Dwight L. Herr, County Counsel, Office of the County Counsel, Santa Cruz, Cal., for County of Santa Cruz.

## MEMORANDUM OF OPINION AND ORDER

SCHWARZER, District Judge.

Plaintiff, Group W Cable, Inc. ("Group W"), brings this action to enjoin defendants, the City and the County of Santa Cruz ("Santa Cruz"),[1] from terminating its cable television franchise in the Santa Cruz area. Group W now moves for summary judgment on three grounds: first, that the City of Santa Cruz breached the allegedly automatic renewal provision of the cable television franchise agreement between Group W's predecessor in interest and the City; second, that Santa Cruz's policy of granting only one franchise to operate a cable television system violates both the First Amendment of the United States Constitution and Article 1, §§ 1 and 2 of the California Constitution; and third, that the specific criteria Santa Cruz employed in evaluating proposals for cable franchises abridge Group W's rights under the First Amendment and the California Constitution.

### I. BACKGROUND

Group W is the sole operator of a cable television system[2] in Santa Cruz under a so-called "non-exclusive" franchise granted by Santa Cruz in May 1966 to Group W's predecessor. Group W serves approximately 37,800 subscribers in Santa Cruz. Its cable system does not, however, extend to areas within Santa Cruz containing approximately 3,118 households. As of 1985, Group W's cable system had a capacity of 35 channels. Its programming consists of a mix of broadcast programming, satellite services such as Cable News Network, pay television services such as HBO, and locally produced programming. Butler Decl., July 18, 1985, ¶¶ 10–12.

---

1. Although the City and the County of Santa Cruz are distinct governmental entities, they have for the most part collaborated as cable television franchising authorities. Unless otherwise noted, all the issues raised in this motion for summary judgment are common to both the City and the County, and the two entities will be referred to collectively as "Santa Cruz".

2. A cable television system commonly consists of a coaxial cable strung over utility poles and through underground conduits and connected

to television sets in subscribing homes and institutions in the community. In addition, a cable television system may provide two-way transmission, which permits subscribers to send back over the cable system responses to programming. See G. Shapiro, P. Kurland & J. Mercuiro, 'Cablespeech,' the Case for First Amendment Protection 1–8 (1983) (hereinafter "Cablespeech"); Sibary, The Cable Communications Policy Act of 1984 v. the First Amendment, 7 Comm/Ent L.J. 381, 383–85 (1985).

The franchise agreement with Santa Cruz expired by its terms in May 1986. In 1982, shortly after Group W acquired the cable system, it attempted to renew the franchise. Despite negotiations stretching over two years, Group W and Santa Cruz could not reach accord on terms for renewal.

In June 1984, Santa Cruz published a Request for Proposals to Provide Cable Television Service ("RFP"), which solicited offers from cable television companies to provide service to the Santa Cruz community. The RFP established minimum criteria for granting a franchise proposal, including that the franchisee provide free access channels for public, governmental and educational or institutional users; provide two-way institutional service capacity; promise basic service to every home in the Santa Cruz service area requesting such service; pay an annual franchise fee of 5% of gross revenue; provide video facilities for free use by local public, educational and governmental programmers; meet certain technical requirements; and provide extensive information relating to financial capability. See RFP. Group W and three other cable companies submitted proposals in response to the RFP.

Group W filed this action against the City and the County of Santa Cruz on November 28, 1984, alleging eleven causes of action. On May 16, 1985 the Court dismissed without prejudice four of the claims[3] on the ground that they were not ripe for adjudication as Santa Cruz had not yet granted or denied either Group W's request to renew its franchise or its RFP proposal. The Court dismissed two claims with prejudice[4] but denied the motion to dismiss the five remaining claims.[5]

Group W moved for a preliminary injunction on July 18, 1985 to enjoin Santa Cruz from implementing its RFP and preventing Group W from providing cable services. On September 19, 1985 the parties stipulated that Santa Cruz could implement its RFP but that Group W's participation in the process would not constitute a waiver of its rights under the First Amendment, the Cable Communications Policy Act of 1984 ("Cable Policy Act" or "Act"), 47 U.S.C. § 571 et seq., or any other applicable law.

On September 23, 1986 Santa Cruz denied Group W renewal of its franchise and a new franchise under the RFP procedure. Santa Cruz determined that Group W's RFP application was nonresponsive to the RFP criteria and, in any event, placed last among the four contenders for the franchise. It granted a franchise to Greater Santa Cruz Cable TV Associates, Inc., the contender it considered best able to meet the criteria called for in the RFP.

Group W renewed its motion for a preliminary injunction,[6] which the Court granted on October 3, 1986. The parties then stipulated that Santa Cruz would not disrupt or discontinue Group W's cable services until final determination of the merits of this action.

On October 10, 1986 Group W moved for summary judgment on its claim that Santa

---

**3.** Claim 1 alleging that defendants breached the Santa Cruz municipal code in failing to renew the Group W franchise; claim 2 alleging that defendants violated the Cable Communications Policy Act of 1984 ("Cable Policy Act" or "Act"), 47 U.S.C. § 521 et seq., in failing to renew the Group W franchise; claim 4 alleging that defendants' RFP process violated California Government Code § 53066.1; and claim 8 alleging that defendants violated California Public Utilities Code § 767.5 in attempting to restrict Group W's access to public utility structures dedicated to the use of cable companies were dismissed without prejudice.

**4.** Claims 9 and 10 for damages for interference with and conspiracy to interfere with contractual relations were dismissed with prejudice.

**5.** These claims consist of claim 3 alleging that the RFP process violated the First Amendment and the due process clause of the Fourteenth Amendment; claim 5 alleging violations of the equal protection clause; claim 6 alleging violations of 42 U.S.C. § 1983; claim 7 alleging violations of the free speech and free press rights granted under Article I, §§ 1 and 2 of the California Constitution; and claim 11 seeking injunctive relief.

**6.** Group W moved for a preliminary injunction before Santa Cruz had reached a final determination on its RFP and renewal applications because Santa Cruz had not awarded a cable franchise nearly one year after the 1984 stipulation.

Cruz's policy of granting a monopoly franchise violated the First Amendment and the California Constitution. Santa Cruz opposed this motion on the merits but argued further that Group W's franchise application did not meet the minimum requirements contained in the RFP. In addition, Group W moved to reinstate its claim that the City of Santa Cruz violated an allegedly automatic renewal provision in Group W's franchise; the Court granted this motion on February 18, 1987.[7] As it appeared that Group W's motion for summary judgment would not be dispositive of the entire case, the Court directed the parties to brief the question whether the specific criteria Santa Cruz applied in rejecting Group W's renewal and RFP proposals violated the First Amendment.[8]

Having considered the arguments advanced in support of and opposition to the motion for summary judgment, the Court concludes, for the reasons discussed in this opinion, (1) that the City's failure to renew the license is not a breach of the franchise agreement, (2) that the policy of granting only a monopoly franchise violates the First Amendment, and (3) that conditioning the award of a franchise on the provision of concessions violates the First Amendment, except that Santa Cruz is entitled (a) to require appropriate evidence of financial responsibility and (b) to charge a reasonable administrative fee and a reasonable fee for Group W's use of public streets and rights of way. What constitutes a reasonable fee will be determined in future proceedings.

## II. DISCUSSION

### A. *Summary judgment*

Under Rule 56(c) of the Federal Rules of Civil Procedure, a trial court shall grant summary judgment for the moving party if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A fact dispute is material only if it must be resolved to decide the motion: "factual disputes that are irrelevant or unnecessary will not be counted as [material]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Thus, a fact is material if it will affect the outcome of the action under the applicable substantive law. However, even if a disputed fact is material, the dispute must be genuine, that is, "the evidence [must be] such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Finally, for purposes of this motion, the court must view the factual evidence in the light most favorable to the nonmoving party. *Beckham v. Safeco Ins. Co. of America*, 691 F.2d 898, 902 (9th Cir.1982).

### B. *Breach of the renewal provision*

Group W contends that the 1966 franchise agreement between its predecessor and the City of Santa Cruz contains a provision that entitled Group W, upon application to the City, to automatic renewal of its franchise.[9] According to Group W, upon filing its application for renewal within the specified time, it became automatically entitled to a franchise from the City under the same terms as the 1966 agreement. This contention is without merit.

This issue turn on the interpretation of a contract, which presents a question of law.

---

7. The Court also granted Group W's motion to reinstate its second claim alleging that Santa Cruz violated the Cable Policy Act in denying Group W's application for renewal.

8. On May 14, 1987 the Court certified to the United States Attorney General pursuant to 28 U.S.C. § 2403(a) that the motion for summary judgment drew into question the constitutionality of the Cable Policy Act. The United States responded in its memorandum that the Cable Policy Act simply vests in local governmental bodies the authority to regulate cable television within the guidelines of the Act. Since the Act authorizes, but does not mandate, the actions taken by Santa Cruz in this case, the constitutionality of the Act is not directly implicated in this action. The Court concurs in this analysis and, accordingly, makes no ruling on the constitutionality of the Act.

9. This claim is only against the City, and not the County, of Santa Cruz.

*In re Beverly Hills Bancorp v. Hine*, 649 F.2d 1329, 1334 (9th Cir.1981).

The relevant provision of the 1966 franchise agreement, codified at § 1721 of the Santa Cruz Municipal Code Ordinance, states:

> FRANCHISE RENEWAL. Any franchise granted under this or any prior Ordinance, is renewable at the application of the grantee, *in the same manner and upon the same terms and conditions as required herein for obtaining the original franchise,* except those which are by their terms expressly inapplicable; provided, however, that the Council may at its option waive compliance with any or all of the requirements of section 1720 hereof.

Administrative record, F 000208 (emphasis added).

■ Group W's interpretation of this provision ignores the highlighted phrase, which obviously refers to the terms and conditions for obtaining a franchise specified elsewhere in the agreement. "A contract is to be interpreted as a whole so as to give meaning to the expressed terms." *California Pacific Bank v. Small Business Admin.*, 557 F.2d 218 (9th Cir.1977). These terms and conditions appear at § 1720, entitled "APPLICATION FOR FRANCHISE." Section 1720 enumerates specific required information concerning the size and location of the cable system and the financial status of the applicant. It also contains the following critical provision:

> (b) Upon consideration of any such application, *the Council may refuse to grant the requested franchise* or the Council may by ordinance grant a franchise for a [cable] system to any such applicant as may appear from said application to be in its opinion best qualified to render proper and efficient [cable] service to television viewers and subscribers in the City.

Administrative record, F 000207 (emphasis added).

"A contract is deemed ambiguous only if it is reasonably and fairly susceptible of different constructions." *Major v. Bishop*, 462 F.2d 1277, 1279 (10th Cir.1972). The enumerated provisions, read together, are susceptible of only one interpretation. Their plain meaning is that a franchisee seeking renewal must comply with the requirements of § 1720 for a franchise application unless compliance is otherwise waived by the City Council. The Council clearly retains the authority to refuse to grant a franchise application, whether the application is for an initial franchise or for a renewal. In this case, the Council acted well within its rights under the agreement when it refused to renew Group W's franchise.

The subsequent course of conduct between the parties confirms this conclusion. For example, in an August 1982 letter to the Assistant County Administrator of Santa Cruz, Group W's vice-president discussed renegotiating its franchise agreements prior to their expiration with both the City and the County. Busch decl., Ex. 1. In addition, in an agreement signed by the parties in September 1982, Group W agreed to submit a proposal to the City "for renegotiated franchises, including provisions for the rebuilding of the system in order to provide state-of-the-art cable television services ..." *Id.*, Ex. 2. It is apparent from this evidence that Group W itself anticipated the need to renegotiate the franchise and did not interpret the agreement as granting an automatic right of renewal.[10]

### C. *First Amendment protection of cable television*

Group W's other two contentions turn on the application of the First Amendment to cable television. Different news media have received different degrees of First

---

**10.** The California cases on which Group W relies are distinguishable. For example, the renewal term of the lease at issue in *Howell v. City of Hamburg*, 165 Cal. 172, 131 P. 130 (1913), provided that the only condition for automatic renewal was "that notice of the intention to exercise the privilege be given the lessor in writing ninety days prior to [termination]." *Id.* at 174. Similarly, the lease in *Becker v. Submarine Oil Co.*, 55 Cal.App. 698, 204 P. 245 (1921), unlike the present franchise agreement, vested no discretion in the lessor to refuse renewal.

Amendment protection. "Each medium of expression ... must be assessed for First Amendment purposes by standards suited to it ..." *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 557, 95 S.Ct. 1239, 1246, 43 L.Ed.2d 448 (1975). Newspapers and other printed media enjoy broad protection from government interference with "the exercise of editorial control and judgment." *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 258, 94 S.Ct. 2831, 2840, 41 L.Ed.2d 730 (1974). The crucial role the press serves in safeguarding democratic government justifies its heightened First Amendment protection. The press "bare[s] the secrets of the government and inform[s] the people. Only a free and unrestrained press can effectively expose deception in government." *New York Times Co. v. United States,* 403 U.S. 713, 717, 91 S.Ct. 2140, 2143, 29 L.Ed.2d 822 (1971) (Black, J., concurring). Accordingly, the government is precluded from dictating "[t]he choice of material to go into a newspaper, ... the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair ..." *Miami Herald,* 418 U.S. at 258, 94 S.Ct. at 2840. Furthermore, there is no doubt that the government would be prohibited under the First Amendment from decreeing that a newspaper is barred from publishing and disseminating information in a specific community.[11]

The broadcast media—i.e. television and radio—also enjoy First Amendment rights, but, unlike the print media, have been subject to a range of affirmative programming requirements by Congress and the Federal Communications Commission ("FCC"). These intrusions into editorial functions have been justified on the basis of the physical scarcity of the broadcast spectrum. The premise articulated in *Red Lion Broadcasting Co. v. United States,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), is that because more speakers wish to broadcast than may be physically accommodated on the electromagnetic spectrum, the government must act as referee in allocating broadcast outlets. The scarcity rationale has been used to justify requirements that broadcasters provide access for opposing viewpoints on issues of public importance.

The scarcity rationale has, however, come under increased attack as more advanced technology has permitted a wider range of broadcasting frequencies. *See* Goldberg, Ross & Spector, *Cable Television, Government Regulation, and the First Amendment,* 3 Comm/Ent L.J. 577, 584–85 (1980–81). Moreover, the FCC recently voted to abandon the so-called fairness doctrine, which required broadcasters to cover contrasting viewpoints on controversial issues of public importance. In announcing its ruling, the FCC stated that "due to the explosive growth in the number of outlets [for public speech], the doctrine is no longer necessary to achieve diversity of viewpoint." New York Times, Aug. 5, 1987, at 20, col. 1. The FCC concluded that "[n]o matter how good the intention, there is no way for Government to restrict freedom of speech or the press and foster a robust and unfettered exchange of ideas." *Id.*

The precise degree of First Amendment protection due cable television, a relatively recent addition to the media, is in doubt. Cable operators, like newspapers, exercise considerable editorial discretion in selecting the mix and content of cable programming. These speech aspects of cable television clearly warrant a degree of First Amendment protection. The Supreme Court held in *City of Los Angeles v. Preferred Communications, Inc.,* 476 U.S. 488, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986) (hereafter *Preferred II*), that a cable television operator has "First Amendment interests," *id.* at 2037, but declined to rule on the exact nature or scope of those interests. Santa Cruz contends that the stan-

---

**11.** Newspapers are, of course, not free from all forms of government regulation. They are, for example, subject to the antitrust laws, *Associated Press v. United States,* 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); labor laws, *Associated Press v. NLRB,* 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953 (1937); and to "ordinary forms of taxation," *Grosjean v. American Press Co.,* 297 U.S. 233, 250, 56 S.Ct. 444, 449, 80 L.Ed. 660 (1936).

*dards governing the broadcast media apply as well to cable, while Group W claims the broader range of protections afforded the print media.*

Although the Supreme Court declined in *Preferred II* to explicate the range of protections due cable television, the Ninth Circuit's opinion in that case offered some guidance on this issue. *Preferred Communications v. City of Los Angeles,* 754 F.2d 1396, 1404 (9th Cir.1985), *aff'd on narrower grounds,* 476 U.S. 488, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986) (hereafter *Preferred I*), like the present action, involved a challenge by one cable operator to a municipality's grant of a single franchise to another cable operator. The Ninth Circuit reversed the district court's dismissal of the cable operator's First Amendment claims. In so doing, the Ninth Circuit stated in *dicta* that cable television is afforded greater First Amendment protection than the broadcast media. *Id.,* 754 F.2d at 1403. According to the court, the physical scarcity rationale underlying government intrusion into the broadcast media does not apply to the cable industry.[12]

Cable television, unlike the broadcast media, has the potential of providing a virtually limitless number of channels. For example, Group W's present system carries 35 channels, while state-of-the-art cable systems can currently accommodate over 100 channels. *See* Sibary, *supra* note 2. Moreover, multiple cable systems can be strung through the preexisting utility infrastructures of most communities, and, with sufficient demand, additional support structures for cable systems could be constructed.

Although differences in the characteristics of the media justify differences in the First Amendment protections afforded them, *Red Lion,* 395 U.S. at 386, 89 S.Ct. at 1805, "the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary. Those principles ... make freedom of expression the rule." *Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 503, 72 S.Ct. 777, 781, 96 L.Ed. 1098 (1952). Therefore, the starting point for the Court's analysis is that unless cable television differs in some material respect from the print media, the First Amendment standards that apply to newspapers apply with equal force to cable. Moreover, the government seeking to impose restrictions bears the burden of demonstrating that unique characteristics of cable television justify making an exception to the rule prohibiting government intrusion into the functioning of the media. *See id.; Preferred I,* 754 F.2d at 1406 n. 9.

Santa Cruz claims that certain characteristics of cable television implicate important or substantial governmental interests, which in turn justify granting an exclusive franchise to the single most qualified applicant and exacting from that applicant a broad range of cable services for the community. Two issues must be addressed: (1) whether Santa Cruz has raised a material question of fact concerning the existence of a substantial governmental interest warranting the grant of a monopoly cable franchise; and (2) whether Santa Cruz has demonstrated the existence of a substantial interest warranting denial of Group W's application under any circumstances or requiring Group W to provide specified services in exchange for a nonexclusive franchise.

## D. *Exclusive franchising under the First Amendment*

Group W contends that Santa Cruz's de facto policy of granting a single cable franchise to the operator of its choice violates Group W's First Amendment and state constitutional rights to freedom of speech and of the press.[13] Santa Cruz defends its policy on three grounds: (1) the utility poles and subsurfaces of streets in Santa Cruz

---

**12.** Although much of *Preferred I* is *dictum* and the Supreme Court's affirmance on narrower grounds renders it largely nonbinding, the Ninth Circuit's analysis is nonetheless persuasive and, where applicable, will be followed here.

**13.** Because the Court finds that Santa Cruz's policy violates the First Amendment, it does not decide whether the policy also violates the California Constitution.

can accommodate only one cable system; (2) because cable television is inherently a natural monopoly, Santa Cruz is justified in awarding a franchise to the single cable television operator best able to serve the community; and (3) permitting more than one cable operator to string cables through Santa Cruz would cause undue disruption to the public domain.

Santa Cruz's selection of only one cable operator purports to be a content-neutral regulation of the nonspeech aspects of cable television. "The First Amendment does not preclude government regulation of non-communicative aspects of speech." *Preferred I*, 754 F.2d at 1405. Rather, "where speech and conduct are joined in a single course of action, the First Amendment values must be balanced against competing societal interests." *Preferred II*, 106 S.Ct. at 2038 (*citing Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 805–07, 104 S.Ct. 2118, 2129–30, 80 L.Ed.2d 772 (1984); *United States v. O'Brien*, 391 U.S. 367, 376–77, 88 S.Ct. 1673, 1678–79, 20 L.Ed.2d 672 (1968)).

In *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), the Supreme Court devised the controlling test for weighing the constitutionality of regulations directed at the non-speech elements of First Amendment conduct. This test provides:

a government regulation is sufficiently justified [1] if it is within the constitutional power of the government; [2] if it furthers an important or substantial governmental interest; [3] if the governmental interest is unrelated to the suppression of free expression; and [4] if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*O'Brien*, 391 U.S. at 377, 88 S.Ct. at 1679.[14] Moreover, the government bears the burden of satisfying each prong of this test. *Preferred I*, 754 F.2d at 1406 n. 9.

### 1. Authority to award a franchise

Group W initially disputes that Santa Cruz has authority to award cable franchises. It argues that California's 1980 enactment of § 767.5 of the California Public Utility Code ("P.U.C.") granted all cable operators the absolute right to erect cable systems without local approval. Section 767.5 obligates California utilities to dedicate unused space on their poles and underground conduits for use by cable operators.[15]

Group W's argument is unconvincing. California Government Code ("Gov.Code") § 53066 [16] expressly authorizes local governing bodies to franchise cable television systems within their jurisdiction, to charge

**14.** The Supreme Court has remarked that the *O'Brien* test "in the last analysis is little, if any, different from the standard applied to time, place, or manner restrictions." *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 298, 104 S.Ct. 3065, 3071, 82 L.Ed.2d 221 (1984).

**15.** California Public Utilities Code § 767.5 provides in relevant part:

(b) The Legislature finds and declares that public utilities have dedicated a portion of such support structures to cable television corporations for pole attachments in that public utilities have made available, through a course of conduct covering many years, surplus space and excess capacity on and in their support structures for use by cable television corporations for pole attachments, and that the provision by such public utilities of surplus space and excess capacity for such pole attachments is a public utility service delivered by public utilities to cable television corporations.

The Legislature further finds and declares that it is in the interests of the people of

California for public utilities to continue to make available such surplus space and excess capacity for use by cable television corporations.

(c) Whenever a public utility and a cable television corporation or association of cable television corporations are unable to agree upon the terms, conditions, or annual compensation for pole attachments or the terms, conditions, or costs of rearrangements, the commission shall establish and enforce the rates, terms, and conditions for pole attachments and rearrangements so as to assure a public utility the recovery of both of the following:

(1) A one-time reimbursement for actual costs incurred by the public utility for rearrangements performed at the request of the cable television corporation.

(2) An annual recurring fee ...

**16.** California Government Code § 53066 provides:

§ 53066. Community antenna television system; franchise or license; rules and regulations

franchise fees, and to prescribe rules and regulations for the protection of subscribers. Although § 767.5 is the later enactment, since 1980 the California legislature has amended § 53066 and enacted other related measures without fundamentally altering the franchising powers of local governments. *See* Gov.Code §§ 53066.01 and 53066.1.[17]

Nor are the two statutes necessarily inconsistent. The legislative history behind § 767.5 makes clear that it was enacted to protect cable operators from the practice of utilities to charge excessive fees for access to utility poles and conduits or to deny such access outright. *See* legislative history of P.U.C. § 767.5 lodged with the court. "[S]ection 767.5 concerns relations between public utilities and cable television corporations ..." *Salvaty v. Falcon Cable Television*, 165 Cal.App.3d 798, 802, 212 Cal. Rptr. 31 (Ct.App.2d Dist.1985). Furthermore, although cable operators make use of public utility support structures, those support structures run over public rights of way, which fall within the jurisdiction of local governing bodies. Section 53066 authorizes governing bodies to regulate the use of their rights of way by cable operators. *See Preferred I*, 754 F.2d at 1413 ("the state has vested its municipalities with discretion in exercising their delegated power to franchise cable television") *and Century Federal, Inc. v. City of Palo Alto*, 648 F.Supp. 1465, 1475 (N.D.Cal. 1986).

Finally, the 1984 Cable Policy Act, 47 U.S.C. § 521 et seq., established a national policy of vesting in local governing bodies authority to franchise and regulate cable communications, subject only to the Act's specified limitations. The Act clearly envisions a franchising model similar to Santa Cruz's procedure.[18] *See Preferred I*, 754 F.2d at 1400 n. 3.

The Court concludes that Santa Cruz is authorized to make franchising arrangements and has thus satisfied the first prong of the *O'Brien* test.

2. *Substantial or important governmental interest*

a. *Physical scarcity*

■ Santa Cruz contends that its existing infrastructure of utility poles and un-

---

Any city or county in the State of California may, pursuant to such provisions as may be prescribed by its governing body, authorize by franchise or license the construction of a community antenna television system. In connection therewith, the governing body may prescribe such rules and regulations as it deems advisable to protect the individual subscribers to the services of such community antenna television system. The award of the franchise or license may be made on the basis of quality of service, rates to the subscriber, income to the city, county or city and county, experience and financial responsibility of the applicant plus any other consideration that will safeguard the local public interest, rather than a cash auction bid. The maximum franchise fee for any franchise or license hereafter awarded pursuant to this section or pursuant to any ordinance adopted under authority of this section by any city or county or city and county shall be 5 percent of the grantee's gross receipts from its operations within such city or county or city and county ... Any cable television franchise or license awarded by a city or county or city and county pursuant to this section may authorize the grantee thereof to place wires, conduits and appurtenances for the community antenna television system along or across such public streets, highways, alleys, public properties, or public easements of said city or county or city and

county. Public easements, as used in this section, shall include but shall not be limited to any easement created by dedication to the city or county or city and county for public utility purposes or any other purpose whatsoever.

17. *See also* 1984 statement of legislative finding and direction, Cal.Gov.Code § 53066.1(p) (West Supp.1984):

While the development and the regulation of cable television is a matter of statewide concern, the Legislature finds and directs that the exercise of the police power of the State of California concerning cable television should, except as otherwise directed by the Legislature, remain in the cities, counties, or cities and counties ...

18. Section 541(a)(1) of the Cable Policy Act expressly grants local governments the power to award "1 or more franchises within its jurisdiction." A franchise authorizes a franchisee to construct a cable system over public rights of way and over easements dedicated to compatible uses. § 541(a)(2). Section 556(c) provides that "any provision of law of any state ... which is inconsistent with this chapter shall be deemed to be preempted and superseded." California Gov.Code § 53066 is largely consistent with the Act.

derground conduits cannot accommodate all the cable operators that initially participated in the RFP process, justifying it in limiting to one the number of operators permitted access. This contention is without merit.

Although Santa Cruz initially received four applications, including Group W's, to establish a cable franchise, currently only two cable companies at most seek concurrent franchises. Greater Santa Cruz Cable TV Associates, Inc., one of the applicants, will operate a cable franchise only if it is guaranteed a monopoly to the Santa Cruz market. Another of the original four applicants has withdrawn. Therefore, only Group W and one other cable company seek concurrent access to the market.

In support of its physical scarcity rationale Santa Cruz offers the declaration of Ed E. Cooper, a veteran of the cable industry. Cooper states that "it is unlikely that any aerial utility infrastructure ... could accommodate four concurrent or nonsimultaneous overbuild systems." Cooper decl. ¶ 14. He argues that Santa Cruz's utility poles cannot accommodate four cable systems, in addition to Group W's existing system. The record shows, however, that Santa Cruz was never confronted with a total of five cable operators seeking concurrent access to utility poles. Santa Cruz received only four RFP proposals, including Group W's, in 1984. By 1986 only two of those four operators were seeking nonexclusive franchises. Even if Cooper's opinion raised a factual issue, it is therefore immaterial to the outcome of this action. *See Anderson,* 106 S.Ct. at 2510. Accordingly, Santa Cruz has failed to raise a genuine issue concerning the capacity of its utility poles and conduits to accommodate two systems.

No doubt the capacity of Santa Cruz's utility infrastructure is finite. But this fact alone cannot justify granting only a single cable franchise. "We cannot accept the City's contention that, because the available space on such facilities is to an undetermined extent physically limited, the First Amendment standards applicable to the regulation of broadcasting permit it to restrict access and allow only a single cable provider to install and operate a cable television system." *Preferred I,* 754 F.2d at 1404.[19]

Santa Cruz has therefore failed to demonstrate the existence of a substantial government interest based on physical scarcity justifying an exclusive franchise.

### b. *Natural monopoly*

Santa Cruz next asserts that the market for cable television in its community can support only one cable franchise. According to Santa Cruz, because the cable market will inevitably give rise to a natural monopoly, government regulation must replace competition as the mechanism ensuring cable television's responsiveness to public needs. It therefore has an "important or substantial governmental interest" in selecting the one cable operator best able to serve the public.

Even if Santa Cruz's factual allegations concerning its cable market are taken as true, the natural monopoly rationale cannot as a matter of law justify Santa Cruz's paternalistic regulatory scheme.

---

**19.** Both the Seventh and the District of Columbia Circuits have held that the physical scarcity rationale, although relevant to the broadcast media with their finite channel capacities, has no application to cable television. *Quincy Cable TV, Inc. v. Federal Communications Commission,* 768 F.2d 1434, 1449 (D.C.Cir.1985), cert. denied, — U.S. —, 106 S.Ct. 2889, 90 L.Ed.2d 977 (1986) *and Omega Satellite Products v. City of Indianapolis,* 694 F.2d 119, 127 (7th Cir.1982). In addition, in *Century Federal v. City of Palo Alto,* 648 F.Supp. 1465 (N.D.Cal.1986), another court in this district rejected the physical scarcity rationale as a justification for regulating cable television to the same degree as the broadcast media. *Id.* at 1471. *Century Federal* involved a cable operator's First Amendment challenge to the use of an exclusive franchising arrangement by neighboring municipalities. The defendant municipalities had applied a policy similar to the one at issue here that granted access to utility poles and substreet easements to the single cable franchise selected on the basis of an RFP. Although the plaintiff in *Century Federal* had never held a cable franchise in the defendant municipalities, as has Group W, the plaintiffs in both that case and the present action were precluded by defendants from sharing the cable market with the only other interested cable operator.

In *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974), the Supreme Court rejected the natural monopoly rationale in the context of newspapers. The Court acknowledged that "the same economic factors which have caused the disappearance of vast numbers of metropolitan newspapers, have made entry into the marketplace of ideas served by the print media almost impossible." *Id.* at 251, 94 S.Ct. at 2836. "The First Amendment interest of the public in being informed is said to be in peril because the 'marketplace of ideas' is today a monopoly controlled by the owners of the market." *Id.* Nonetheless, the Court concluded that "press responsibility is not mandated by the Constitution and like many other virtues it cannot be legislated." *Id.* at 256, 94 S.Ct. at 2839.

This principle applies with equal force to the medium of cable television. Government selection of an exclusive First Amendment speaker, whether a newspaper or a cable operator, "creates a serious risk that [government] officials will discriminate among [speakers] on the basis of the content of, or views expressed in, their proposed [speech]." *Preferred I*, 754 F.2d at 1406. The First Amendment cannot tolerate this risk. "What may foster economic efficiency most certainly inhibits the [F]irst [A]mendment." *Century Federal*, 648 F.Supp. at 1477.[20]

The Court recognizes that this view is not universally shared. The Seventh, Eighth and Tenth Circuits have each held that the natural monopoly rationale provides a basis for denying a cable operator access to the market. *See Central Telecommunications, Inc. v. TCI Cabletelevision, Inc.*, 800 F.2d 711 (8th Cir.1986), *cert. denied*, — U.S. —, 107 S.Ct. 1358, 94 L.Ed.2d 528 (1987); *Omega Satellite Products Co. v. City of Indianapolis*, 694 F.2d 119 (7th Cir.1982); *Community Communications Co. v. City of Boulder*, 660 F.2d 1370 (10th Cir.1981), *cert. dismissed*, 456 U.S. 1001, 102 S.Ct. 2287, 73 L.Ed.2d 1296 (1982). *See also Berkshire Cablevision of Rhode Island, Inc. v. Burke*, 571 F.Supp. 976 (D.R.I.1983), *vacated and remanded*, 773 F.2d 382 (1st Cir.1985). These courts rely on essentially two theories to reach the conclusion that natural monopoly characteristics of cable justify greater government intrusion into the medium.

First, the courts reason that cable systems, like public utilities, operate most efficiently when they serve the entire market. Until a triumphant cable company competing in a free market drives out its competitors, there will be duplication of facilities and higher prices for consumers. Government regulation of such a natural monopoly avoids these hazards, thereby maximizing economic efficiency and consumer welfare.[21]

While the economic argument standing alone may be persuasive, it ignores the First Amendment values implicated in cable television. So long as physical scarcity does not make some limitation on access to the market unavoidable, First Amendment considerations preclude vesting the power to control access in a governmental agency.

20. The District of Columbia Circuit has also rejected the natural monopoly theory as a ground for regulating cable television: "while *Miami Herald* involved the conventional press, ... there is no meaningful 'distinction between cable television and newspapers on this point.'" *Quincy Cable*, 768 F.2d at 1450, quoting *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 46 (D.C.Cir.) (*per curiam*), *cert. denied*, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977).

21. Judge Posner set out the analysis in *Omega Satellite*, 694 F.2d at 126:

You can start with a competitive free-for-all—different cable television systems frantically building out their grids and signing up subscribers in an effort to bring down their average costs faster than their rivals—but eventually there will be only a single company, because until a company serves the whole market it will have an incentive to keep expanding in order to lower its average costs. In the interim there may be wasteful duplication of facilities. This duplication may lead not only to higher prices to cable television subscribers, at least in the short run, but also to higher costs to other users of the public ways, who must compete with the cable television companies for access to them. An alternative procedure is to pick the most efficient competitor at the outset, give him a monopoly, and extract from him in exchange a commitment to provide reasonable service at reasonable rates.

Santa Cruz may have legitimate interests in matters that concern it, such as protecting public safety and maintaining public thoroughfares, but promoting economic efficiency is not among them. The risk of intrusion into editorial judgment is too great to permit the government to select the exclusive cable operator. *Preferred I,* 754 F.2d at 1406–07. The notion that economic efficiency warrants such intrusion is to the Court's knowledge unprecedented.

Second, these courts also reason that because government may regulate those physical aspects of the cable industry that affect the public domain, government also has free rein to regulate economic aspects of the industry. For example, in *Community Communications* the Tenth Circuit distinguished *Miami Herald* from a case involving monopoly franchising of a cable operator on the ground that "Miami Herald involved an effort by state government to compel public access to a medium that is not tied to government in the way cable companies necessarily are. There, the characteristic of economic scarcity was unrelated to the disruptive use of the public domain requiring a government license." *Community Communications,* 660 F.2d at 1379.[22] In other words, the government's interest in regulating cable's impact on the public domain gives it authority to select the operator entitled to exercise the franchise.

This argument too ignores First Amendment constraints. Under the *O'Brien* test the government may regulate speakers only as required to further its interests. Whatever monopolistic tendency the cable market may have has nothing to do with the government's interest in licensing potentially disruptive uses of the public domain. Santa Cruz may be correct that only one cable operator will prove economically viable. However, it has not demonstrated that its interest in minimizing physical disruption legitimizes giving it the right to determine who that operator will be. *See infra* at 966–67.

### c. *Physical disruption*

Santa Cruz also argues that the physical and aesthetic disruption of the public domain that will necessarily result from the construction of multiple cable systems justifies granting a single franchise. According to Santa Cruz, the installation of multiple cable systems will require replacing some utility poles with taller poles, adding anchoring cables to utility poles, and rearranging cables on existing poles. In addition, approximately one-fourth of the new cables will be laid under streets. Underground installations of cables will result in cuts that permanently weaken the road surfaces and may damage the substreet pipes and cables of vital utilities. Both aerial and underground cable installations are bound to disrupt traffic and diminish the aesthetic appeal of Santa Cruz.

Cable television does require the use of public facilities. Santa Cruz has "legitimate interests in public safety and in maintaining public thoroughfares." *Preferred I,* 754 F.2d at 1406. "[T]his provides a justification for some government regulation." *Id.* The question, however, is whether it provides a sufficient justification for the granting of a monopoly franchise.

Santa Cruz supports its physical disruption argument with the declarations of Ed Cooper and two administrators of the Santa Cruz Department of Public Works. *See* Cooper, Erwin and Fantham decls. Each declarant states that the nonsimultaneous installation of four new cable systems would result in undue disruption to Santa Cruz's thoroughfares. The scenario described by these declarants of four cable operators installing cables without any coordination, however, has no factual basis. In fact, only two cable operators, Group W and another company, would install cable systems. While Santa Cruz claims that four cable operators are incapable of coordinating their installations so that community disruption would be limited to one in-

---

**22.** In contrast to a newspaper, a cable operator "must significantly impact the public domain in order to operate; without a license, it cannot engage in cable broadcasting to disseminate information." *Community Communications,* 660 F.2d at 1379.

stallation at a time, it does not address the question whether two cable operators could install their systems simultaneously without undue disruption. *See* Cooper decl., ¶ 12.

Moreover, Santa Cruz's data is based on the assumption that it will have to endure the disruption of a single cable installation followed by the dismantling of Group W's existing system after the new system is installed. If Santa Cruz can tolerate the nonsimultaneous installation of a new system and removal of Group W's existing system, it is difficult to perceive the existence of a substantial government interest in preventing the installation of the second system at the same time as Group W's existing cables are replaced.

Indeed, Santa Cruz's own evidence undercuts any claim that the simultaneous installation of two cable systems would result in a significant disruption to the public streets. According to data prepared by Cooper, two cable systems with shared facilities would call for replacing fewer than two percent of Santa Cruz's utility poles and rearranging one percent of its power lines and ten percent of its telephone lines. Cooper decl., Ex. 3. Although according to Santa Cruz seventy percent of the guy wires and wire anchors supporting the poles would require replacement or rearrangement, this appears unlikely to have any significant effect on traffic or the appearance of the utility poles. Furthermore, Santa Cruz does not offer comparative statistics demonstrating the impact on its utility poles and lines of the initial installation of a new cable system followed by the removal of Group W's system—the likely outcome if Santa Cruz were to prevail in this litigation.

█ In sum, Santa Cruz has failed to raise a genuine issue as to whether granting a monopoly cable franchise will materi-

ally further its interest in minimizing the physical disruption of the public domain.[23]

### d. *Conclusion*

█ Santa Cruz has failed to come forward with evidence sufficient to raise a genuine issue as to whether its policy of granting only a single cable franchise is supported by any important or substantial government interest. Accordingly, it has failed to sustain its burden under the second prong of the *O'Brien* test, and the policy therefore violates the First Amendment.

### E. *Conditions imposed on Group W*

Finally, Group W contends that Santa Cruz may neither exclude it from the Santa Cruz market nor exact from it concessions as a condition for admitting it, other than reimbursement for administrative costs. According to Group W, because the RFP process and criteria empower Santa Cruz to exact a broad range of concessions from a franchisee, they are constitutionally invalid.

Santa Cruz counters that the "First Amendment allows a public entity to impose reasonable minimum requirements upon any cable operator seeking access to the cable market and deny noncompliance to an operator, entrenched or perspective [sic], if it fails to comply with those requirements." Def.'s suppl. memo. in oppos. to s.j., at 4. Santa Cruz alleges that imposition of the RFP criteria and rejection of Group W's application for noncompliance with those criteria serve important governmental interests.

Although Santa Cruz is precluded from legislating a cable monopoly, it does not necessarily follow that Santa Cruz must "open its doors to all cable-television comers, regardless of size, shape, quality, qualifications or threat to the ultimate capacity of the system." *Pacific West Cable Com-*

---

**23.** Santa Cruz also defends its policy on the ground that Group W can continue to transmit its programs over an access channel leased from the franchised cable system. But the First Amendment forbids Santa Cruz from restricting Group W's speech by offering Group W a less adequate alternative to a cable franchise: "one

is not to have the exercise of his liberty of expression in an appropriate place abridged on the plea that it may be exercised in some other place." *Schneider v. State,* 308 U.S. 147, 163, 60 S.Ct. 146, 151, 84 L.Ed. 155 (1939). *See Century Federal,* 648 F.Supp. at 1469 n. 8.

*pany v. City of Sacramento,* 798 F.2d 353, 355 (9th Cir.1986). The question before the Court is whether Santa Cruz can reconcile with the First Amendment the requirements and conditions to which Group W objects. Having rejected the physical scarcity and natural monopoly rationales as grounds for Santa Cruz's regulation of the cable medium, the Court must consider whether Santa Cruz's legitimate interest in minimizing physical disruption of the public domain or any other asserted interest can justify the regulations at issue. For the purposes of this discussion, these regulations may be divided into four categories: (1) public access requirements; (2) technical requirements; (3) provisions concerning Group W's financial capability; and (4) franchise fees.[24]

### 1. *Public access requirements*

The RFP requires the franchisee to devote separate access channels to public, governmental and institutional users. RFP at 14–15. The franchisee may not charge a fee for use of these channels. In addition, the franchisee must finance, staff and make available for free public use at least one fully equipped production studio and one to two mobile production units. RFP at 15 and 20.

Santa Cruz plans to create an agency to administer these channels and facilities, which will have primary responsibility for adopting rules governing the use of channel time and facilities and for scheduling and coordinating their use. RFP at 15–16. The franchisee must fund this agency. RFP at 20. In addition, the franchisee must be willing to provide local governments additional channel capacity at no charge or reduced charges and facilities and equipment at reduced charges. RFP at 20.[25]

Santa Cruz contends that these measures further the First Amendment interests of the community by ensuring that the cable system will carry a diverse range of viewpoints.

If applied to the press, these requirements would surely violate the First Amendment. *See Preferred I,* 754 F.2d at 1401 n. 4 ("Imposing access requirements on the press would no doubt be invalid"). For example, *Miami Herald* held unconstitutional a state right-of-reply statute requiring newspapers to publish the replies of public candidates who were criticized in the papers. More recently, *Pacific Gas & Electric Co. v. Public Utilities Commission of California,* 475 U.S. 1, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986), found unconstitutional a Commission ruling requiring a utility to mail in its billing envelopes the statements of organizations with viewpoints in opposition to those expressed by the utility in its customer newsletters. The Supreme Court concluded in both *Miami Herald* and *Pacific Gas* that these access requirements constituted content-based regulation of the press and impermissibly interfered with editorial control and discretion.

Santa Cruz attempts to distinguish *Miami Herald* and *Pacific Gas* on the ground that the access regulations in those cases were triggered by the newspapers' content, while the right of access called for in the RFP is not contingent on the content of the cable operator's statements. According to Santa Cruz, "[a]ccess comes automatically and without extensive governmental intervention." Def.'s oppos. to suppl. mot. for s.j., at 12.

On closer scrutiny, however, the access requirements cannot be characterized as content-neutral. Access does not, as Santa Cruz claims, come "automatical-

---

24. The Court does not address Group W's challenge to the preference expressed in the RFP for franchise applicants organized as limited partnerships. Because no limited partnerships applied for franchises, Santa Cruz's preference was not a criterion of selection.

25. Group W's challenge to the access requirements presents a justiciable controversy notwithstanding that Group W included in its fran-chise proposal provisions for access channels and funding which Santa Cruz found responsive to the RFP. Group W filed its RFP application subject to a full reservation of rights; simply because Group W considered it prudent to respond to Santa Cruz's access requirements does not render those requirements constitutional as applied to Group W or waive Group W's constitutional objections.

ly"; rather, under the scheme envisaged in the RFP, access is meted out by a government agency that enjoys unlimited discretion to devise rules governing the use of access time and facilities and to schedule the use of such time and facilities. Santa Cruz has thus reserved to itself broad power to designate the speakers entitled to package their messages using the franchisee's production facilities and to air their views using the franchisee's cable system. Santa Cruz reserves the power to designate when and for how long speakers may produce and transmit their messages. In practice, Santa Cruz can turn the access channels and facilities into forums for attacks on the editorial views expressed by the franchisee. Like the newspapers in *Miami Herald* and *Pacific Gas*, a cable operator in Santa Cruz may be deterred from airing its views for fear that this will trigger—indeed, force it to produce and fund—the response of an opposing group. Furthermore, this access scheme potentially grants the incumbent government a free platform from which to advance its own views and candidates.

In concluding that the RFP poses these risks, the Court need not pass on Santa Cruz's motives in adopting access requirements. "Illicit legislative intent is not the *sine qua non* of a violation of the First Amendment ... [E]ven regulations aimed at proper governmental concerns can restrict unduly the exercise of rights protected by the First Amendment." *Minneapolis Star v. Minnesota Comm'r of Rev.*, 460 U.S. 575, 592, 103 S.Ct. 1365, 1376, 75 L.Ed.2d 295 (1983). Content-based regulation, as Santa Cruz's access requirements must be characterized, "may be sustained only if the government can show that the regulation is a precisely drawn means of serving a compelling state interest." *Consolidated Edison Co. v. Public Service Commission*, 447 U.S. 530, 540, 100 S.Ct. 2326, 2335, 65 L.Ed.2d 319 (1980). *First Nat'l Bank of Boston v. Bellotti*, 435 U.S.

765, 786, 98 S.Ct. 1407, 1421, 55 L.Ed.2d 707 (1978); *Buckley v. Valeo*, 424 U.S. 1, 65, 96 S.Ct. 612, 656, 46 L.Ed.2d 659 (1974).

Santa Cruz has not met this burden. "The First Amendment interest of the public in being informed," *Miami Herald*, 418 U.S. at 251, 94 S.Ct. at 2836, cannot justify the risk that the franchisee's speech will be chilled or that the government will abuse its discretion to serve its own interest, rather than the public's, at the expense of the franchisee. Moreover, Santa Cruz has failed to demonstrate that in this respect cable operators are entitled to less First Amendment protection than newspapers. The physical scarcity rationale that may justify the imposition of narrowly drawn access requirements on broadcasters does not apply to this case; nor does Santa Cruz assert any rational nexus between its legitimate interest in minimizing cable's disruption of the public domain and its attempt to regulate public access to cable television.[26]

### 2. *Technical requirements*

Group W objects to the array of technical requirements imposed by Santa Cruz. For example, the RFP requires that the franchisee provide a minimum of 54 channels. RFP at 11. Basic service to residential subscribers must consist of at least 30 channels. RFP at 12. The RFP also dictates the mix of programming the franchisee must offer, including local and distant television broadcast signals; "cable program" packages such as non-pay satellite services; and automated, pay cable, audio, access, handicapped and regional programming services. RFP at 11–12. All residential subscribers must be offered a basic viewing package of local television broadcast signals, access channels, automated services and "cable program" services. Separate automated service channels are to be devoted to a program guide and a community bulletin board. RFP at 12.

The RFP also calls for proposals for a "state-of-the-art" system and requires the

---

**26.** *Erie Telecommunications, Inc. v. City of Erie,* 659 F.Supp. 580 (W.D.Pa.1987), which upheld municipal cable access regulations, is distinguishable. The franchise agreements at issue in that case provided for access on a first-come, first-served nondiscriminatory basis, *id.* at 600. Moreover, the views expressed in *Erie* conflict with those expressed in *Preferred I,* if not *Preferred II;* indeed, *Erie* makes no mention of either decision.

franchisee to submit detailed specifications for the technical features and capabilities of the proposed system. RFP at 24–30.

The franchisee is further required to provide a two-way cable for institutional use. The institutional cable must have the capacity for interactive transfer of audio, video and data information among its users. The franchisee is further required to develop such governmental uses of the cable system as water meter reading, security services and computer data transfer. All these services are to be provided to governmental users at no charge and to other institutional users at no charge or a reduced fee. RFP at 13–14.

In addition, Santa Cruz requires the franchisee to offer basic cable services to every home in the City and County requesting such service. Santa Cruz concedes that line extension to homes in outlying and sparsely populated areas is costlier than extension to other areas, and so permits the franchisee to charge these subscribers a specified surcharge over the basic subscriber rate and, under certain circumstances, a specified capital contribution. RFP at 23–24.

Santa Cruz found Group W's franchise proposal nonresponsive to the minimum requirements of the RFP because the proposal did not guarantee community-wide line extension. The RFP proposal was also considered deficient because it failed to guarantee an institutional network and services and promised only to upgrade the existing system, not rebuild a state-of-the-art system. Resolution of City of Santa Cruz, Oct. 14, 1986 ("City Resolution"), at 9, 40–45; Resolution of County of Santa Cruz, Oct. 21, 1986 ("County Resolution"), at 9, 40–45. In addition, Santa Cruz found that the quality of Group W's past service was "not reasonable" to meet the needs of the community. City Resolution at 54–55; County Resolution at 54–55.

Santa Cruz argues that these requirements maximize the public benefits of cable television while still permitting the cable franchisee to realize a reasonable profit. This justification does not pass the test articulated in *Miami Herald* for regulation of the communicative aspects of the press. *Miami Herald* made clear that a government regulation that intrudes into the editorial functions of the press cannot survive, even if the newspaper "would face no additional costs to comply ... and would not be forced to forgo publication of news or opinion ..." 418 U.S. at 258, 94 S.Ct. at 2839. Thus the relevant point is not that a franchisee could earn a reasonable profit if it complied with Santa Cruz's technical requirements, but rather that these requirements impermissibly intrude into the editorial functions of cable operators. "The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper ... constitute the exercise of editorial control and judgment. It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with the First Amendment guarantees of a free press ..." *Id.*

If Santa Cruz applied analogous regulations to a newspaper seeking access to the Santa Cruz market, they would be plainly invalid. Regulations dictating a cable operator's channel capacity, quality of service, mix of programming, institutional service, and extension of service to outlying areas would be akin to legislation requiring a newspaper to print a minimum number of pages, use paper and ink of only a certain quality, cover a specified range of subjects, print information and data of interest to government and institutional readers free of charge, provide free subscriptions to government and institutional readers, and offer home delivery to any subscriber residing anywhere in the community at a price fixed by the government. Such measures, if imposed on a newspaper, would certainly violate the First Amendment. Santa Cruz has not shown why cable operators would be entitled to less protection.

 Furthermore, these regulations are not narrowly drawn to advance Santa Cruz's substantial interest in minimizing physical disruption to the public domain. *See Perry Ed. Ass'n. v. Perry Local Educators' Ass'n.*, 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983). The blan-

ket requirement that the franchisee provide service to every home requesting it, regardless of the physical obstacles to line extension in the given area, is likely to result in more, not less, physical disruption to the public domain. Although Santa Cruz might argue that a one-time installation of a new state-of-the-art cable system will reduce the need for piecemeal repairs and replacement of an obsolete system, it has not demonstrated the inadequacy of more narrowly drawn measures for minimizing the disruptive aspects of cable repairs.

Finally, these regulations cannot be sustained on the ground that they are meant to protect consumers from shoddy cable service provided by inept or unscrupulous cable franchisees. The challenged measures do not attack this evil with sufficient precision. If Santa Cruz wishes to address it, it can do so with consumer protection laws and criminal statutes designed to deter and punish such misconduct; it need not intrude into the editorial discretion of cable operators to achieve its goals. *Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 637, 100 S.Ct. 826, 836, 63 L.Ed.2d 73 (1980).

Therefore, as a matter of law, the technical requirements imposed in the RFP impermissibly interfere with the First Amendment rights of cable operators.

### 3. *Financial capability*

The RFP requires a prospective franchisee to submit extensive information concerning its ownership, finances and experience in the cable field and ten-year projections of operating costs and revenue. RFP at 32–117. Group W objects to these disclosure requirements on the ground that they are expensive and burden the exercise of First Amendment rights.

Santa Cruz has a legitimate interest in protecting public safety and maintaining public thoroughfares and to this end may regulate the noncommunicative aspects of cable television through reasonable time, place and manner restrictions tailored to advance that interest. *Pacific West*, 798 F.2d at 355; *O'Brien*, 391 U.S. at

377, 88 S.Ct. at 1679. Accordingly, its disclosure requirements must be measured against the *O'Brien* test to determine whether they unduly burden Group W's First Amendment rights.

Santa Cruz contends that "the bulk of the information relates to the ability and willingness of an applicant to meet the RFP minimum requirements and translate its proposal into operational reality." Def.'s suppl. memo. in oppos. to mot. for s.j., at 18.

To the extent the information sought relates only to an applicant's ability to comply with the access and technical regulations invalidated above, Santa Cruz has no legitimate interest in requiring its disclosure.

Santa Cruz does have a substantial governmental interest in minimizing the physical disruption that could occur if a cable operator lacks the financial resources to install and maintain a cable system safely and expeditiously. It may therefore require an applicant to submit relevant evidence of financial responsibility and operational competence. It may not, however, deny a franchise for the failure to answer questions that are irrelevant to its interest in minimizing disruption of the public domain. Nor may it reserve to itself discretion to select from among applicants the operator it considers best qualified.

A significant portion of the disclosure questionnaire contained in the RFP is premised on the assumption that Santa Cruz will be substantially regulating the franchisee. But as the Court has held, Santa Cruz must confine its regulation to measures serving its interest in curbing physical disruption. To this end, Santa Cruz may require an applicant to post a reasonable performance bond, obtain adequate insurance and submit evidence of competence to operate the system, to the extent necessary to prevent harm to the City and the County. It may not, however, demand disclosure of the scope presently required by the RFP.

### 4. Franchise fee

The RFP requires the franchisee to pay a "franchise fee" of 5% of its gross revenue from the franchise. RFP at 19. Although a portion of these payments may constitute reimbursement to Santa Cruz for its administrative costs in licensing and administering a cable franchise, Santa Cruz concedes that the franchise fee would exceed its administrative costs and generate revenue.

Group W contends that the First Amendment precludes Santa Cruz from charging a licensing fee greater than necessary to defray its legitimate regulatory costs. *See Fernandes v. Limmer,* 663 F.2d 619, 633 (5th Cir.1981), *cert. denied,* 458 U.S. 1124, 103 S.Ct. 5, 73 L.Ed.2d 1395 (1982); *Baldwin v. Redwood City,* 540 F.2d 1360, 1371 (9th Cir.1976), *cert. denied,* 431 U.S. 913, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977). The franchise fee is unconstitutional, Group W argues, because it singles out cable operators and conditions the exercise of First Amendment rights on the payment of a tax.[27]

In *Murdock v. Pennsylvania,* 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943), the Supreme Court held that a fee imposed by municipal ordinance upon persons soliciting orders or delivering goods, including books and pamphlets, could not be levied on persons who distributed religious literature. The Court premised its holding on the principle that "[a] state may not impose a charge for the enjoyment of a right guaranteed by the federal constitution." *Id.* at 113, 63 S.Ct. at 875.

More recently, in *Minneapolis Star and Tribune Co. v. Minnesota Commissioner of Revenue,* 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983), the Court struck down a state "use tax" on the cost beyond the first $100,000 of paper and ink consumed in the production of a publication. This tax in effect applied only to large newspapers in the state. The Court was guided by two general principles: first, "a

tax that singles out the press, or that targets individual publications within the press, places a heavy burden on the State to justify its action," *id.* at 592–93, 103 S.Ct. at 1376, and second, to satisfy that burden, the government must demonstrate "a counterbalancing interest of compelling importance that it cannot achieve without differential taxation." *Id.* at 585, 103 S.Ct. at 1372. The Court concluded that although the asserted state interest—generating revenue—was compelling, it could be achieved as effectively by a general tax on all businesses. *Id.* at 586, 103 S.Ct. at 1372.

Santa Cruz argues that *Murdock* and *Minneapolis Star* have no application to this case. It contends that the franchise fee is not a tax for raising general revenue but rather is reasonable compensation for the permanent easement over and under city and county streets conferred by the franchise.

Santa Cruz relies on *Gannett Satellite Information Network, Inc. v. Metropolitan Transportation Authority,* 745 F.2d 767 (2d Cir.1984), which upheld a revenue-raising license fee imposed by the Metropolitan Transportation Authority ("MTA") on the placement of coin operated newspaper vending machines in MTA commuter train stations. The court held that the MTA stations were an appropriate public forum for the exercise of a publisher's right to distribute its newspapers from vending machines. It found, however, a crucial distinction between the cases prohibiting licensing fees and *Gannett:* in the former cases the government acted in a governmental capacity in "raising general revenue under the guise of defraying administrative costs," *id.* at 774, while in *Gannett* the MTA operated in a proprietary capacity in charging what was in essence reasonable rent for the use of business property which it happened to own.

---

27. Group W also objects on the same grounds to such in-kind payments imposed by the RFP as the free access and institutional channels and services discussed above. *Supra* at 968–71. Because the Court invalidates these requirements on other grounds, it does not reach the question

whether they constitute an unconstitutional tax on the exercise of Group W's First Amendment rights. Accordingly, the Court's analysis is confined to the issue of the constitutionality of the franchise fee.

*Id.* at 775. Consequently, the fees constituted "permissible manner restrictions which serve the significant governmental interest of raising revenue ..." *Id.* Nor did the MTA have at its disposal a less restrictive means of raising revenue than to charge for the use of its facilities and services. *Id.*

To resolve this issue the Court must examine the character of the property used by Group W and the nature of the rights granted in the franchise. Because the franchise fee is directed at the noncommunicative aspects of Group W's First Amendment activities, the four-pronged *O'Brien* test determines whether it constitutes a permissible restriction. *See supra* at 962.

### a. *Authority to charge a fee*

Santa Cruz clearly has statutory authority to charge an appropriate franchise fee. Although in P.U.C. § 767.5 the California legislature dedicated surplus space on utility structures for use by cable operators, the legislature also reserved to local governments authority to charge up to a 5% franchise fee for the privilege of permanently occupying public streets. Gov.Code § 53066. *See supra* at 962–63. Moreover, the 1984 Cable Policy Act authorizes local franchising authorities to charge up to a 5% annual franchise fee over and above the numerous financial .exactions permitted under the Act. 47 U.S.C. § 542(b).

Group W maintains that Santa Cruz's public thoroughfares are a traditional public forum, access to which may not be conditioned upon the payment of a revenue-raising fee. This argument, however, fails to recognize that cable television's use of public streets differs from that of other First Amendment speakers. Cable television is unique in that it requires the permanent occupation of space on utility poles and through underground conduits to the exclusion of other potential users of the same space.

In *Members of the City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984), the Supreme Court rejected the contention that public utility poles should be treated as a traditional public forum for the purpose of posting signs simply because they are located on streets—the classic public forum. *Id.* at 2134.

Following *Vincent*, the Ninth Circuit in *Preferred I* dismissed the argument that because public utility poles and conduits are located on or under public streets they constitute a traditional public forum for the purpose of stringing coaxial cables. 754 F.2d at 1409. However, the Ninth Circuit held that since California has dedicated surplus space on utility structures for use by cable companies and the municipality itself held out access to public thoroughfares through the franchising process, the utility structures ·did constitute a limited public forum. Thus, although the municipality could not deny all access to the utility structures, it could condition that access on reasonable time, place and manner regulations. *Id.*

### b. *Substantial governmental interest*

Like the MTA in *Gannett*, Santa Cruz has a substantial governmental interest in charging a reasonable fee as compensation for the grant of a permanent interest in public property. A cable franchise confers on the franchisee an interest in public property that differs significantly from the public's general right to travel over public streets. For example, in *Cox Cable San Diego, Inc. v. County of San Diego*, 185 Cal.App.3d 368, 229 Cal.Rptr. 839 (Cal.App. 4th Dist.1986), a California Court of Appeal held that a cable franchise grants a taxable possessory interest in real property. A cable operator's license to use the public thoroughfares bears such indicia of a possessory interest as exclusiveness, durability, independence and private benefit. *Id.*, 229 Cal.Rptr. at 843–44. Thus Santa Cruz has an interest in requiring compensation for the grant to a private entity of such an interest in public property.[28]

---

**28.** *City of Alameda v. Premier Communications Network, Inc.*, 156 Cal.App.3d 148, 202 Cal.Rptr. 684 (Ct.App. 1st Dist.), *cert, denied,* 469 U.S. 1073, 105 S.Ct. 567, 83 L.Ed.2d 508 (1984),

### c. Unrelated to the suppression of free speech

Nor can Group W argue that Santa Cruz has singled out cable operators from other similar users of public streets and facilities. Santa Cruz charges the Pacific Gas and Electric Company a franchise fee of 2% of gross revenues attributable to the franchise in return for the right to lay pipes and cables along public streets and highways in which Santa Cruz has a proprietary interest. Wilson decl., Exs 1 and 2; Busch decl., Exs 3 and 4. *See County of Sacramento v. Pacific Gas and Elec. Co.*, 193 Cal.App.3d 300, 238 Cal.Rptr. 305 (Cal. App.Dep't Super.Ct.1987). Such fees have been approved by the California legislature, which has authorized local governments to charge public utilities an annual franchise fee of 2% of the gross receipts of the franchisee "arising from the use, operation, or possession of the franchise." P.U.C. § 6006.[29] Thus, Santa Cruz's interest in receiving remuneration for the grant of a valuable right to occupy public property must be construed as being "unrelated to the suppression of free expression." *O'Brien*, 391 U.S. at 377, 88 S.Ct. at 1679.[30]

### d. Burden is no greater than is essential

██ Finally, the imposition of a reasonable fee creates an "incidental restriction on … First Amendment freedoms [that] is no greater than is essential to the furtherance" of Santa Cruz's interest in receiving compensation for the use of its property. *O'Brien*, 391 U.S. at 377, 88 S.Ct. at 1679. Santa Cruz has a substantial interest in being paid the fair market value of what it has conveyed. A charge in excess of fair market value would, however, not be sufficiently tailored to Santa Cruz's proprietary interest in its property and thus would unreasonably burden Group W's ability to exercise its First Amendment freedoms. Although an excessive fee would further Santa Cruz's interest in raising revenue, this interest could be achieved as effectively by a general tax on all businesses. *Minneapolis Star*, 460 U.S. at 586, 103 S.Ct. at 1372.

Relying on *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 299, 104 S.Ct. 3065, 3072, 82 L.Ed.2d 221 (1984),[31] the Second Circuit declined in *Gannett* to address the question of what constitutes a reasonable fee for placing a newsrack in an MTA station or how such a fee must be determined. 745 F.2d at 775 n. 4. The court concluded that the "MTA is in a better position to establish commercially viable fee arrangements than is the court." *Id.* *Gannett* also relied on the open marketplace for newspaper sales to provide protection against unreasonable licensing fees. *Id.*

which invalidated a business license fee imposed on a television subscription service, is distinguishable. A television subscription service receives program signals from a satellite and retransmits those signals by microwave. *Id.*, 156 Cal.App.3d at 152, 202 Cal.Rptr. 684. Unlike a cable television service, it makes no more use of public property than a newspaper.

**29.** This fee is expressly tied to the use by the utility of rights of way over public property; receipts attributable to the franchisee's use of rights of way over private property must be excluded from the base to which the 2% charge applies. *See, e.g., Tulare v. City of Dinuba*, 188 Cal. 664, 673–74, 206 P. 983 (1922); *Los Angeles County v. Southern Counties Gas Co. of Cal.*, 42 Cal.2d 129, 136–37, 266 P.2d 27 (1954) (In Bank).

**30.** Santa Cruz also charges other licensees who make permanent use of public property license fees ranging from 3% to 20% of gross revenues.

*See* Exs. to Wilson and Busch decls. For example, use of the county government center for a special event typically requires payment of a fee of 3% of gross proceeds, while a franchise to operate a concession at a county park requires payment of a fee of 10 to 15% of gross revenues. Busch decl., Exs. 10 and 9.

**31.** *Clark* suggested that the government need not apply the least restrictive regulation imaginable to pass the fourth prong of the *O'Brien* test. *Cf.* 468 U.S. at 297, 104 S.Ct. at 3071 ("if the parks would be more exposed to harm without the sleeping prohibition than with it, the ban is safe from invalidation under the First Amendment"). *See also United States v. Albertini*, 472 U.S. 675, 689, 105 S.Ct. 2897, 2907, 86 L.Ed.2d 536 (1985) ("an incidental burden on speech is no greater than is essential, and therefore is permissible under *O'Brien*, so long as the neutral regulation promotes a substantial government interest that would be achieved less effectively absent the regulation").

The instant case is distinguishable from *Gannett,* however, because Group W, unlike the Gannett newspapers, has no alternative means to reach the viewing public in the Santa Cruz area. *See* 745 F.2d at 774. Santa Cruz controls the property and facilities essential to gaining access. While the Court does not propose to arrogate to itself the authority to replace the officials of Santa Cruz in the management of its property, *Clark,* 468 U.S. at 299, 104 S.Ct. at 3072, it cannot abdicate its responsibility to protect First Amendment freedoms against restrictions in the form of excessive fees.

Although the RFP nominally requires only a 5% franchise fee, it also calls for a variety of other concessions which, aside from infringing the First Amendment for reasons heretofore discussed, add substantially to the cost imposed on the cable operator.[32] Moreover, neither the 5% fee nor the in-kind charges purport to bear any relationship to the fair market value of the right to use Santa Cruz property pursuant to a franchise.

Nor does existing legislation help in determining fair value. Both Congress and the California legislature limit franchise fees to 5% of gross revenues but permit local franchising authorities to impose a range of in-kind charges on cable franchisees. *See* 47 U.S.C. § 542(g); H.R.Rep. No. 934, 98th Cong., 2d Sess. 65, *reprinted in* 1984 U.S.Code Cong. & Ad.News 4655, 4702 (the Act "defines as a franchise fee only monetary payments made by the cable operator, and does not include as a 'fee' any franchise requirements for the provision of services, facilities or equipment"); Cal.Gov.Code § 53066 ("[t]he award of the franchise ... may be made on the basis of ... income to the ... city and county").

Determination of what constitutes a reasonable fee must turn principally on an appraisal of the fair market value of the rights of way, easements and other entitlements to use, occupy or traverse Santa Cruz property incidental to the exercise of Group W's cable franchise. Because such appraisals are routinely made in the ordinary course of municipal and private affairs, the Court expects the parties to arrive at an appropriate figure by negotiation (without prejudice, of course, to their respective positions on substantive issues). If, after reasonable efforts have been made, they are unable to agree on a figure, each party shall submit to the Court the report of a qualified appraiser supporting its position as to what constitutes a reasonable fee. Such reports shall be submitted no later than November 20, 1987. The Court will at that time determine what further proceedings are required.

■ In addition, Santa Cruz is entitled to charge a reasonable fee to defray the administrative costs of issuing the franchise. For the reasons stated in this opinion, those costs should cover only the relatively minor clerical services required. Hence, the administrative fee is expected to be nominal. Again, the Court expects the parties to make a reasonable effort to reach an agreement. In the absence of an agreement, they are directed to submit their respective proposals with supporting materials by November 20, 1987.

The pendency of proceedings for the determination of fees and charges shall not stay the finality of the judgment to be entered pursuant to this order. Fed.R. Civ.P. 54(b).[33]

### ORDER

The motion of Group W for a permanent injunction is granted and the Santa Cruz defendants are hereby permanently enjoined from applying the RFP to or enforc-

---

32. A study in the early 1980's of a typical cable system in a top 50 television market found that franchise fees, free service to government buildings and public access facilities and services consume 21% to 24% of subscriber revenues. *Cable Television Regulation: Hearings Before the Senate Comm. on Commerce, Science, and Transportation,* 97th Cong., 2d Sess. 236–37 (1982).

33. Group W also challenges a proposed cable television franchise ordinance and agreement which were contained in the RFP. Because Santa Cruz evidently adopted neither in final form and because, in any event, they would not apply to Group W in light of this opinion, the Court does not address them.

ing it against Group W, or otherwise interfering in the operation of Group W's cable television franchise, except as may be consistent with the foregoing opinion.

Counsel for Group W shall submit a form of judgment approved by defendants as to form by September 25, 1987.

The Court will hold a status conference, which may be by telephone, on October 9, 1987, at 10 a.m.

IT IS SO ORDERED.